## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____

**CROCS, INC.,**

      Plaintiff,

v.

**CAPE ROBBIN INC.,**
**CROCSKY,**
**FULLBEAUTY BRANDS INC. d/b/a KINGSIZE,**
**HAWKINS FOOTWEAR, SPORTS, MILITARY & DIXIE STORE,**
**HOBIBEAR SHOES AND CLOTHING, a Colorado Limited Liability Company,**
**HOBBY LOBBY STORES, INC.,**
**INK TEE,**
**LOEFFLER RANDALL INC.,**
**MAXHOUSE RISE LTD.,**
**PW SHOES, INC. a/k/a P&W,**
**SHOE-NAMI, INC.,**
**WALMART INC.**
**YOKI FASHION INTERNATIONAL LLC, AND**
**QUANZHOU ZHENGDE NETWORK CORP., d/b/a AMOJI,**

      Defendants.

---

## CROCS, INC.'S COMPLAINT

---

Plaintiff Crocs, Inc., through its undersigned counsel, brings the following Complaint against Defendants Cape Robbin, Inc., Crocsky, Fullbeauty Brands Inc. d/b/a Kingsize, Hawkins Footwear, Sports, Military & Dixie Store,  Hobibear Shoes and Clothing, a Colorado limited liability company, Hobby Lobby Stores, Inc.,  Ink Tee, Loeffler Randall Inc., Maxhouse Rise Ltd., PW Shoes, Inc. a/k/a P&W, Shoe-Nami, Inc., Walmart Inc., Yoki Fashion International LLC, and Quanzhou ZhengDe Network Corp., d/b/a Amoji (collectively, "Defendants"), as follows:

## THE PARTIES

1.      Plaintiff Crocs, Inc. ("Crocs") is a Delaware corporation having its principal place of business at 13601 Via Varra in Broomfield, Colorado 80020.

2.      On information and belief, Defendant Cape Robbin, Inc. ("Cape Robbin") is a California corporation with its principal place of business located at 1943 West Mission Blvd., Bldg. F in Pomona, CA 91766.

3.      On information and belief, Defendant Crocsky ("Crocsky") is an unincorporated business with its principal place of business at 1401 Lavac St., Austin, TX 78701.

4.      On information and belief, Defendant Fullbeauty Brands, Inc. d/b/a Kingsize ("Fullbeauty") is a Delaware corporation with its principal place of business at 1 New York Plaza, New York, NY 10004.

5.      On information and belief, Defendant Hawkins Footwear, Sports, Military & Dixie Store ("Hawkins") is an unincorporated business with its principal place of business at 6083 New Jesup Hwy., Suite J, Brunswick, GA 31523.

6.      On information and belief, Defendant Hobibear Shoes and Clothing Ltd. ("Hobibear") is a Colorado limited liability company with its principal place of business at 173 N. 17th Ct., Brighton, CO 80601.

7.      On information and belief, Defendant Hobby Lobby Stores, Inc. ("Hobby Lobby") is an Oklahoma corporation with its principal place of business located at 7707 SW 44th St., Oklahoma City, OK 73179.

8.      On information and belief, Defendant Ink Tee ("Ink Tee") is an unincorporated business with its principal place of business at 811 Wilshire Blvd., Los Angeles, CA 90017.

9.     On information and belief, Defendant Loeffler Randall Inc. ("Loeffler Randall") is a New York corporation with its principal place of business at 588 Broadway, Ste. 1203, New York, NY 10012.

10.    On information and belief, Defendant Maxhouse Rise Ltd. ("Maxhouse Rise") is a Hong Kong corporation with its principal place of business at Flat A, 25/F, United Centre, 95 Queensway, Hong Kong.

11.    On information and belief, Defendant PW Shoes, Inc. a/ka/ P&W Shoes ("PW") is a New York corporation with its principal place of business at 5830 Grand Ave., 3a, Maspeth, NY 11378.

12.    On information and belief, Defendant Walmart Inc. is a Delaware corporation with a principal place of business at 702 S.W. 8th St., Bentonville, AR 72716.

13.    On information and belief, Defendant Yoki Fashion International LLC ("Yoki") is a New York limited liability company with a principal place of business at 1410 Broadway, Suite 1005, New York, NY 10018.

14.    On information and belief, Defendant Shoe-Nami, Inc. ("Shoe-Nami") is a Louisiana corporation with a principal place of business located at 91 Westbank Expressway, Gretna, LA 70053.

15.    On information and belief, Defendant Quanzhou ZhengDe Network Corp. d/b/a Amoji ("Amoji") is a Chinese corporation with its principal place of business located at Rm. C-409, No. 2 YanZhi Gallery, Licheng District, Quanzhou, Fujian Province, China 362002.

## JURISDICTION AND VENUE

16.    This is an action under Section 32(1) of the Lanham Act (15 U.S.C. § 1114(1)); Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B); Section 43(a)(1)(A) of the

Lanham Act, 15 U.S.C. § 1125(a)(1)(A); Section 43(c) of the Lanham Act (15 U.S.C. § 1125(c)); and Colorado common law.

17.     This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338.

18.     This Court also has pendent jurisdiction over the Colorado law claims pursuant to 28 U.S.C. § 1367 because the claim is so related to the other claims in the action over which the Court has original jurisdiction that they form part of the same case or controversy.

19.     This Court has personal jurisdiction over Cape Robbin because Cape Robbin has deliberately engaged in significant and continuous business activities within Colorado, including sales of its Accused Products described below to residents of this District over the internet.

20.     This Court has personal jurisdiction over Crocsky because Crocsky has deliberately engaged in significant and continuous business activities within Colorado, including sales of its Accused Products described below to residents of this District over the internet.

21.     This Court has personal jurisdiction over Fullbeauty because Fullbeauty has deliberately engaged in significant and continuous business activities within Colorado, including sales of its Accused Products described below to residents of this District over the internet.

22.     This Court has personal jurisdiction over Hawkins because Hawkins has deliberately engaged in significant and continuous business activities within Colorado, including sales of its Accused Products described below to residents of this District over the internet.

23.     This Court has personal jurisdiction over Hobibear because on information and belief Hobibear is a resident of this District and has its principal place of business in this District. The Court also has personal jurisdiction over Hobibear because Hobibear has deliberately engaged

in significant and continuous business activities within Colorado, including sales of its Accused Products described below to residents of this District over the internet.

24.     This Court has personal jurisdiction over Hobby Lobby because Hobby Lobby has deliberately engaged in significant and continuous business activities within Colorado, including sales of its Accused Products described below to residents of this District over the internet. Further, and on information and belief, Hobby Lobby has multiple retail stores in Colorado.

25.     This Court has personal jurisdiction over Ink Tee because Ink Tee has deliberately engaged in significant and continuous business activities within Colorado, including sales of its Accused Products described below to residents of this District over the internet.

26.     This Court has personal jurisdiction over Loeffler Randall because Loeffler Randall has deliberately engaged in significant and continuous business activities within Colorado, including sales of its Accused Products described below to residents of this District over the internet.

27.     This Court has personal jurisdiction over Maxhouse Rise because Maxhouse Rise has deliberately engaged in significant and continuous business activities within Colorado, including sales of its Accused Products described below to residents of this District over the internet.

28.     This Court has personal jurisdiction over PW because PW has deliberately engaged in significant and continuous business activities within Colorado, including sales of its Accused Products described below to residents of this District over the internet.

29.     This court has personal jurisdiction over Walmart because Walmart has deliberately engaged in significant and continuous business activities within Colorado, including sales of its

Accused Products described below to the residents of this District over the internet. Further, and on information and belief, Walmart has multiple retail stores in Colorado.

30. This Court has personal jurisdiction over Yoki because Yoki has deliberately engaged in significant and continuous business activities within Colorado, including sales of its Accused Products described below to residents of this District over the internet.

31. This Court has personal jurisdiction over Shoe-Nami because Shoe-Nami has deliberately engaged in significant and continuous business activities within Colorado, including sales of its Accused Products described below to residents of this District over the internet.

32. This Court has personal jurisdiction over Amoji because Amoji has deliberately engaged in significant and continuous business activities within Colorado, including sales of its Accused Products described below to residents of this District over the internet.

33. Venue is proper in this District against every Defendant pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims set forth herein occurred in Colorado through at least Defendants' unauthorized use of the Asserted Trademarks in commerce in Colorado. The Asserted Trademarks are described below.

## GENERAL ALLEGATIONS

## I.   THE ASSERTED TRADEMARKS

34. Crocs owns valuable trademarks. These trademarks include Crocs' iconic design marks, which are federally registered as U.S. Trademark Registration No. 5,149,328 ("the '328 Registration) (Exhibit 1) and U.S. Trademark Registration No. 5,273,875 (the '875 Registration) (Exhibit 2), and they also include a common law trademark on the vamp of the shoe (the "Vamp Mark") (the '328 Registration, '875 Registration, and the Vamp Mark, collectively, "the 3D Marks" or the "Crocs 3D Marks"). as well as the word mark "CROCS", which is registered as U.S. Trademark Registration No. 3,836,415 ("the '415 Registration", "the Word Mark", or "the Crocs

Word Mark") (Exhibit 3) (the 3D Marks and Word Mark collectively, the "Asserted Trademarks"). Where appropriate, the three Federally registered trademarks are distinguished from the Vamp Mark the "Registered Trademarks."

35. The Word Mark is on the Principal Register of the United States Patent and Trademark Office ("PTO"), and the '328 and '875 Registrations are on the PTO's Principal-2(F) register.

### A. The Crocs 3D Marks and Crocs Word Mark

36. The Crocs 3D Marks consist of a three-dimensional configuration of the outside of an upper for a shoe, featuring round holes placed across the horizontal portion of the upper. In addition, the '328 and '875 Registrations have a textured strip along the vertical portion of the upper having trapezoidal openings. Furthermore, the design of the '875 Registration also depicts a textured strip on the heel of the shoe, and a decorative band along the length of the heel strap. The 3D Marks were first used in commerce in June 2003. Images of these marks are reproduced below, with the Vamp Mark found on the horizontal portion of the upper for both figures:[1]

**FIGURE 1: Representative Images of Crocs 3D Marks**

| Registration No. 5,149,328 | Registration No. 5,273,875 |
| --- | --- |
|  |  |

---

[1] These images are reproduced several times in this complaint. For the sake of convenience, the Vamp Mark is not provided as a separate diagram.

37.     The Word Mark encompasses several standard character marks for "CROCS", which are registered for use in footwear and in lightweight, slip-resistant footwear specifically. The Word Mark was first used in November 2002.

38.     Neither the 3D Marks nor the Word Mark were subject to a prior registration or unsuccessful registration.

### 1.     The Crocs 3D Marks and Crocs Word Mark Are Famous

39.     As set forth below, the Asserted Trademarks are widely recognized by the general consuming public of the United States as a designation of origin of the footwear products that are manufactured, sold, distributed, and promoted by Crocs. In particular, the Asserted Trademarks are widely publicized both by Crocs and third parties; products bearing the Asserted Trademarks are sold extensively throughout the United States; the Asserted Trademarks are widely recognized by the consuming public; and the Asserted Trademarks enjoy federal trademark registration.

### a.     Crocs Distributes Shoes Bearing the Asserted Trademarks Through Many Different Channels and Market Segments

40.     Crocs distributes its iconic footwear through a vast network of domestic distribution channels, including major retailers and department stores such as Nordstrom, Journeys, Foot Locker, Finish Line, Urban Outfitters, Shoe Carnival, Designer Shoe Warehouse, and Famous footwear; sporting good and outdoor retailers such as REI, Dick's Sporting Goods, and Academy Sports; and online retail outlets like Zappos.com, Shoes.com, and Amazon.com. Crocs also distributes its footwear through various and sundry specialty channels, including gift shops, collegiate bookstores, uniform suppliers, independent bicycle dealers, specialty food retailers, and health and beauty stores. Crocs footwear is available for sale in countless store locations domestically, and in over 90 countries worldwide. In addition, Crocs sells its footwear through its website, www.crocs.com, and in Crocs' own retail stores all over the world.

41. Crocs' iconic Classic Clog was conceptualized during a sailing trip and originally presented to consumers as a boat shoe. Soon after, it became apparent that the shoe appealed to consumers of all demographics seeking fun and friendly, comfortable footwear. By 2005, the Crocs shoe reflected in the Crocs 3D Marks had become recognized as a new standard-bearer in the fashion footwear, professional footwear, and casual lifestyle footwear markets.

42. Figure 2, below, highlights how the Classic Clog incorporates the 3D Marks:

**FIGURE 2: Representative Images of Crocs 3D Marks with the Classic Clog**

| Registration No. 5,149,328 | Registration No. 5,273,875 | The Classic Clog |
|---|---|---|



43. For the past two decades, Crocs has produced footwear, including the Classic Clog, that bears the Crocs 3D Marks and the Crocs Word Mark. These footwear products are marketed for men, women, and children of all ages. Crocs' customers come from all backgrounds, occupations, education and income levels, and geographic regions in the United States.

44. Through unconventional collaborations with different brands, celebrities, and artists, the Classic Clog continues to reach diverse and specific psychographic market segments as the shoe is regularly repackaged into new footwear models bearing the Crocs 3D Marks and Word Mark. The list of these partnerships includes modern pop artists like Justin Bieber and Post Malone, Los Angeles high-fashion apparel brands Pleasures and Chinatown Market, the luxury department store Barney's New York, and fast-food chain KFC.

45. Shoes bearing the Crocs Word Mark are equally ubiquitous across different market segments, if not more so, since they include the clog-like shoes embodied in the Crocs 3D Marks,

as well as each and every variation thereof that is produced and sold by Crocs. The Crocs Word Mark is thus featured on all types of footwear, including boots, flip-flops, sneakers, flats, platforms, sandals, wedges, and slides.

46.     The Crocs Word Mark and Crocs 3D Marks also appear in footwear marketed and sold to specific occupational groups, such as the restaurant, hospitality, and healthcare industries. The rise in stay-at-home workers caused by the COVID-19 pandemic has created additional market reach into occupational segments, as working professionals have sought out comfortable, casual footwear for use during the remote workday at home.

47.     Finally, Crocs has generated substantial revenue from the sales of its footwear products bearing the Asserted Trademarks.  Over the past three calendar years, for example, Crocs has sold millions of pairs of shoes bearing the Asserted Trademarks in the United States alone, corresponding to hundreds of millions of dollars in revenue.

        **b.     The Crocs Asserted Trademarks Receive Substantial Publicity and the Marks Are Widely Recognized by the Consuming Public**

48.     Since its debut, Crocs footwear bearing the Crocs 3D Marks and Crocs Word Mark has received substantial publicity. By 2006, the Classic Clog had already morphed into "a global phenomenon" thanks to its distinctive look. And that same year, the company's success was recognized with a marketing award for garnering more than 800 million editorial impressions.

49.     Notwithstanding marketing efforts, the design of the iconic Crocs footwear, which is depicted in the Crocs 3D Marks, is itself responsible for generating much of the publicity that Crocs receives. Its unusual and distinctive appearance caused an uproar in the fashion footwear world, and it has made the classic Crocs shoe a source of unending debate. The footwear even inspired an anti-Crocs movement on social media with millions of followers, and an "I Hate Crocs" blog, which sold its own anti-Crocs merchandise. Public figures caught wearing Crocs shoes in

public have helped to keep the media spotlight trained on shoes bearing the Crocs 3D Marks and Crocs Word Mark. President George W. Bush made international news when he was seen wearing a pair of Classic Clogs. Former First Lady Michelle Obama also drew international attention when she was spotted in shoes with heels bearing Crocs Trademarks. And in the United Kingdom, Prince George caused Crocs footwear sales to skyrocket after he wore a pair of Crocs bearing the Crocs Trademarks.

50.     Other celebrities have also kept attention on Crocs by wearing the shoes in public, including television and movie stars like Jack Nicholson, Whoopi Goldberg, John Cena, Shia LaBeouf, Jennifer Garner, and Sacha Baron Cohen, and famous musicians like Ariana Grande, Post Malone and Justin Bieber.

51.     The Crocs 3D Marks and Crocs Word Mark receive substantial publicity on social media, too. For example, a viral video "Crocs Shaving Cream Challenge" has led to hundreds of thousands of online videos consisting of "filling a Crocs shoe with shaving cream and then jamming your foot in." Similarly, a viral six-second video of a grandmother wearing the classic Crocs shoe has received tens of millions of views. In addition to these viral videos, an almost infinite number of memes featuring the Crocs shoe have spread across different social media platforms, a trend which even Crocs itself has embraced. Indeed, the Classic Clog garnered nearly 25 billion observed media impressions in 2020 alone.

### c.     The Asserted Trademarks Are Federally Registered

52.     Two of the Crocs 3D Marks were federally registered on February 28, 2017 as U.S. Trademark Registration No. 5,149,328, and on August 29, 2017 as U.S. Trademark Registration No. 5,273,875. The Vamp Mark is a common law trademark.

53.     The Crocs Word Mark was federally registered on August 24, 2010, as U.S. Trademark Registration No. 3,836,415 (renewed October 4, 2019).

### 2. The Crocs 3D Marks Are Not Functional

54.     The 3D Marks feature one-of-a-kind ornamental design characteristics that give the overall impression of a fun and distinctively quirky clog-like shoe for which Crocs is well-known. The distinctively gentle slope of the upper gives the shoe a unique, recognizable outline.

55.     Given the virtually infinite number of different, non-infringing footwear styles in existence today, and which are available to other footwear companies, Crocs' competitors do not have any actual competitive need to use the Crocs 3D Marks in commerce.

56.     As explained in greater detail below, the Crocs 3D Marks are intentionally and frequently copied, not due to competitive need, but because of the significant goodwill that the Crocs 3D Marks have accumulated over the past two decades during their use by Crocs.

### B. Crocs Licenses the Asserted Trademarks

57.     Crocs has only licensed the Asserted 3D Marks on one occasion, and thus has an especially keen interest in protecting them from the kind of confusion and dilution that occurs from the unlicensed use of its marks by knockoffs that are labeled with the name of the knockoff's manufacturer. Crocs has not licensed the Word Mark.

58.     Specifically, in 2017, Crocs unveiled a licensing partnership with famed footwear designer Balenciaga. These shoes retailed for $850, and were described as one of the "hottest trends" of 2018 by Business Insider.

59.     The Balenciaga/Crocs cross-over shoe was a smashing success: the shoes sold out during pre-release before they were even officially available for purchase. They were offered on e-commerce sites including Barneys New York. *Id.*

60.     The cross-over shoes incorporate the 3D Marks. Notably, the shoes feature round holes placed across the horizontal portion of the upper, and a textured strip along the vertical portion of the upper having trapezoidal openings. In addition to these features, the shoes also have

a textured strip on the heel of the shoe, and a decorative band along the length of the heel strap, as contemplated by the '875 Registration. A representative image of these shoes are shown below:



61.     A close-up of the shoe reveals Balenciaga's name on the button connection the heel strap to the body of the shoe, which replaces the usual Crocs logo found in the same spot:



62.     Other configurations of the shoe included Balenciaga's name as a shoe charm:



## II.     PLAINTIFF CROCS

### A.     History of Crocs

63.     Crocs was founded in 2002 by three college friends and innovators who shared a love for sailing. That year, co-founder Scott Seamans saw a shoe developed and manufactured by Canadian company Foam Creations, Inc. He came up with the idea to add a foam strap to the shoe, and the Classic Clog was born. He and his friends George Boedecker and Lyndon "Duke" Hanson embarked on a Caribbean sailing trip on a quest to perfect the shoe and, by November 2002, Crocs had sold its first thousand pairs of shoes. After expanding domestic distribution and production capacity, Crocs acquired Foam Creations in June 2004. Around that time, Crocs also added warehouses and shipping programs for speedy assembly and delivery.

64.    Crocs launched its first national marketing campaign in 2005 after partnering with a local Colorado advertising firm. The campaign played on the distinctively quirky design elements of the clog-like shoe that is embodied in the Crocs 3D Marks, and across the country, it spread the company's message that "Ugly Can Be Beautiful."

65.    Continuing in an upward trajectory, Crocs began to lay the foundation for an Initial Public Offering ("IPO"). The company turned a net profit of $16.7 million for 2005, and was named "Brand of the Year" by Footwear News. Then, in 2006, Crocs launched the largest footwear IPO in history, raising approximately $208 million in its 9.9 million-share offering.

66.    The 2008 economic downturn impacted Crocs as hard as it did any other company. It was not until 2011 that Crocs saw its first rebound, when it opened hundreds of new stores and reported sales of $1 billion worldwide for the first time in its history.

67.    Building on this success, the company implemented a return to the basics that relied on the goodwill it had established around the Crocs 3D Marks and Crocs Word Mark over the past decade by reintroducing the Classic Clog with attention-grabbing celebrity partnerships and a fresh ad campaign that acknowledged the company's detractors. The new "Come As You Are" campaign invited footwear shoppers to be themselves, and to recognize the false choice between comfort and style by embracing quirky, clog-like foam shoes.

68.    During the past few years, Crocs has seen continued and steady sales growth as a result of its revitalization. In 2020, the largest global fashion search platform, Lyst, reported that, based on web searches, the Classic Clog that is embodied in the Crocs 3D Marks was the eighth most wanted item in the world. The New York Times declared that "Crocs Won 2020," and fashion bloggers predicted that "2021 will be the Year of the Croc."

69. The sale of footwear bearing the Crocs 3D Marks and Crocs Word Mark is responsible for the edification of Crocs as an institution in the footwear industry, and the goodwill built into these marks that continue to carry the company to greater heights.

**B.    Crocs Footwear**

70. Today, Crocs footwear can be found in hundreds of forms and color patterns, ranging from khaki canvas loafers to tie-dyed sandals. Among this wide variety of options, the Classic Clog that features the Crocs 3D Marks, as well as the Crocs Word Mark, remains the company's flagship shoe.

71. Crocs has produced multiple lines of footwear that embody the Crocs 3D Marks and the Crocs Word Mark, beginning with the classic "Beach" model when the company first launched. The "Beach" Crocs shoes were soon after followed by the "Cayman", "Metro" and "Bistro" lines that also reflect one or more of the Crocs Marks. As the brand's forebearers, these shoes in particular have inspired countless imitations.

72. The Crocs Word Mark appears on all of its shoe models and the Crocs 3D Marks are also reflected in numerous Crocs styles and models, including at least the following current footwear, each of which may include multiple models: Classic Clog (including Bae, Platform and All-Terrain models), Baya Clog, Freesail Clog, and Crocs Littles Clog.

**C.    Crocs Vigorously Defends its Intellectual Property, Including its 3D Marks and Word Mark**

73. Crocs devotes significant time and resources to stopping infringement of its 3D Marks and Word Mark. Its enforcement actions are diverse and multifaceted, ranging from full litigation to educational outreach depending on what is warranted by the circumstances.

74. The scale of this infringement requires constant attention. Each year, enforcement officials around the world, including authorities in the United States, seize hundreds of thousands

of shoes that improperly bear the Crocs 3D Marks and/or Word Mark. For many of these products, the United States is the intended final destination. In more recent years, the rise in consumer online shopping has enabled the sale of infringing footwear on an unprecedented scale. For example, in 2018, Crocs' defense efforts resulted in the termination of over 70,000 online auctions for infringing products, and the shutdown of over 1,500 websites, in the United States alone.

75.      Crocs works with various third-party agencies to monitor and eradicate the infringing use of the 3D Marks and Word Mark. One such agency Crocs has used is MarkMonitor, which monitors websites around the world for unauthorized or improper use of Crocs' trademark in their website content; the use of the Crocs brand in a domain name to redirect traffic to websites containing sponsored links or product listing for footwear sold by other companies; or web articles containing Crocs' trademarks that are used to drive traffic to paid links.

## III.    DEFENDANTS

76.      On information and belief, Defendants include manufacturers, distributors, and retailers that use the Asserted Trademarks in commerce without Crocs' permission in a manner that is detrimental to Crocs and the goodwill and reputation Crocs enjoys with consumers. The particular Asserted Trademarks that each Defendant has violated or is violating is set forth in Table 1 below:

**TABLE 1: Asserted Trademarks Violated by Defendants' Accused Products**

| Defendant's Accused Products | U.S. Trademark Registration No. 5,149,328 (The 3D Mark) | U.S. Trademark Registration No. 5,273,875 (The 3D Mark with the textured heel and Decorative Band) | The Vamp Mark | The CROCS Word Mark |
|---|:---:|:---:|:---:|:---:|
| Cape Robbin | X | X | X | |
| Vigilante | X | X | X | |
| Gardener | X | X | X | |
| Crocsky: Crocsky Clog | X | X | X | X |
| Fullbeauty Brands d/b/a Kingsize | X | X | X | |
| Hawkins Footwear: Kids Rubber Clogs | X | X | X | |
| Hobibear: Classic Graphic Garden Clogs Slip on Water Shoes | X | X | X | |
| Hobby Lobby: White Foam Clog Ladies Shoes | X | X | X | X |
| Ink Tee: Crocs Clog Shoes | X | X | X | X |
| Loeffler Randall: Ezra Black Rubber Clog | X | X | X | |
| Walmart Inc. & Maxhouse Rise: Sandal | X | X | X | |
| PW Shoes: Spring Summer Toddler Boys' Slingback Sandal Clogs | X | X | X | |
| Yoki: Lolli | X | X | X | |
| Shoe-Nami | X | X | X | |
| *See* Cape Robbin: Vigilante | X | X | X | X |
| *See* Cape Robbin: Gardener | X | X | X | X |
| *See* Yoki: Lolli | X | X | X | |
| *See* Wild Diva: Tomika | X | X | X | X |
| Toasty Clogs | X | X | X | X |
| Fruity with Charms | X | X | X | X |
| ZhengDe Network d/b/a Amoji: Garden Clogs | X | X | X | |

### A.   Cape Robbin

77.     On information and belief, Cape Robbin Inc. ("Cape Robbin") is a California corporation with its principal place of business located at 1943 West Mission Blvd., Bldg. F Pomona, CA 91766.

### 1.   Cape Robbin's Background

78.     On information and belief, Cape Robbin was founded on or before August 2011. Cape Robbin's website claims that the company "is a LA based fast fashion women footwear brand. We aim at delivering the latest fashion in women's footwear to our CrBabes across the globe."

79.     Cape Robbin sells its products, including the Accused Products (**NB: not a defined term**) described below, directly through its website, caperobbin.com. On information and belief, Cape Robbin further sells Accused Products through a series of retailers, who in turn sell Accused Products online and through brick-and-mortar stores and through a variety of e-commerce platforms.

### 2.   Cape Robbin's Accused Products

80.     Cape Robbin uses a variety of lengthy, descriptive names to market and sell its Accused Products. For example, one type of Accused Product, the "Vigilante" footwear product is sold at least under the following names: "Vigilante-3 Ankle Strap Cut Out Hole Sandal with Pins-Sage", "Vigilante-6 Ankle Strap Cut Out Hole Sandal with Gems-Black", and "Vigilante-7 Clogs Slippers for Women, Women's Fashion Comfortable Slip on Slides Shoes with Fur." On information and belief, "Vigilante" footwear products that are child-sized are sold under the name "Garden Doll."

81.     For convenience, the general styles of Accused Products sold by Cape Robbin include, but are not limited to: (a) the "Gardener" footwear product, which is sold with and without

a fur lining; and (b) the "Vigilante" footwear product, which is also sold with and without a fur lining, and the colorable imitations of these two types of footwear products.

82.     Representative images of the "Vigilante" footwear products are shown below:



83.     Representative images of the "Gardener" footwear products are shown below:



84.     On information and belief, Cape Robbin has promoted and sold additional shoe models bearing the 3D Marks under various names and style descriptions.

85.     The Accused Products are manufactured abroad and are imported into the United States. Specifically, and as seen in the pictures above, the shoes have a label stating "Made in China."

**3.     Cape Robbin's Unfair Acts, Infringement, and Dilution of the Crocs 3D Marks**

86.     For the reasons set forth below, Cape Robbin's Accused Products infringe and are likely to dilute Crocs 3D Marks.

a.    **Crocs Owned Protectable and Famous Trademark Rights Before Cape Robbin Promoted and Sold Accused Products**

87.    On information and belief, based on the extensive monitoring performed on Crocs' behalf described above, Cape Robbin began promoting and selling the Accused Products after the Asserted Registered Trademarks were registered and became well-recognized and famous, and after the Vamp Mark was first used in commerce.

88.    The '328 Registration and '875 Registration relevant to Cape Robbin's violations are also the subject of duly issued United States Trademark Registrations.

b.    **Cape Robbin's Accused Products Are Likely to Cause Confusion with the Crocs 3D Marks, and Have Already Caused Actual Confusion**

89.    As shown in Figure 3 below, Cape Robbin's Accused Products bear designs that are likely to cause confusion with the Crocs 3D Marks. In particular, the size, positioning, number, and shape of the holes on the horizontal portion of the upper of the Accused Products are confusingly similar to the 3D Marks. In addition, the Accused Products have a textured strip along the vertical portion of the upper with trapezoidal openings which further contributes to the likelihood of consumer confusion. The Accused Products further have a textured strip on the heel of the shoe, and a decorative band along the length of the heel strap.

**FIGURE 3: Representative Images of Cape Robbin Accused Products and the Crocs Asserted Trademarks**



| Accused Products | Registration No. 5,149,328 | Registration No. 5,273,875 |
|---|---|---|
| "Vigilante" | | |
| "Gardener" | | |

90.     On information and belief, Consumers have actually confused Cape Robbin's Accused Products with Crocs' footwear products that bear the 3D Marks. For example, one of Cape Robbin's retailers, Bijora Inc., d/b/a Akira, features reviews of "Verified Buyers" of Cape Robbin's Accused Products on its website, shopakira.com. One such "Verified Buyer" Toya, claims in a January 18, 2021 review that "I so love my crocs":

---

**Toya** *Verified Buyer*                                          1/18/2021
⭐⭐⭐⭐⭐

Happy customer

I so love my crocs, prefect price and color

---

91.     Another "Verified Buyer", Bianca, wrote a review on December 28, 2020 stating,

"I love these platform crocs":

---

**Bianca** *Verified Buyer*                                          12/28/2020
⭐⭐⭐⭐⭐

AMAzinG

I love these platform crocs. I wear them all the time and they're very
comfortable. i am a size 7 but since I wanted to wear fluffy sock with them, I
ordered an 8 and they fit great. These are some of my favorite shoes I've
gotten in Akira. I came back to buy more in the different colors

---

92.     A third "Verified Buyer" named "Princess" again called the shoes "Crocs":

---

**Princess** *Verified Buyer*                                          6/23/2019
⭐⭐⭐⭐⭐

Comfy Crocs

I received so many compliments on my shoes. They are very comfortable and
easy to walk in. Satisfied purchase.

---

93.     Yet a fourth "Verified Buyer" named Kiara titled her June 4, 2019 review "Best

crocs" and wrote that they "look so comfy":

---

**Kiara** *Verified Buyer*                                              6/4/2019
★★★★★
Best crocs
Look so comfy

---

94.     These reviews evidence the actual confusion consumers had for Cape Robbin's Accused "Gardener" Products even at the point of sale.

> **c.     Cape Robbin Intended to Copy the Crocs 3D Marks and to Infringe and Dilute the Crocs 3D Marks**

95.     Cape Robbin's intent to create associations with Crocs and to free ride on Crocs' goodwill is evident from at least the close similarities between Cape Robbin's Accused Products on the one hand, and the famous Crocs 3D Marks on the other hand. On information and belief, the overwhelming similarities are due to Cape Robbin's intentional copying.

> **d.     Cape Robbin Promotes and Sells Accused Products in Competition with Crocs' Promotion and Sales of Products Bearing the Asserted Trademarks**

96.     On information and belief, Cape Robbin promotes and sells its Accused Products online through its own website, caperobbin.com, as well as through other online retailers such as shopakira.com, amazon.com, lamodishboutique.com, and shoenami.net. On information and belief, Cape Robbin has also sold its Accused Products through various other retail stores and internet sites.

97.     On information and belief, Cape Robbin's Accused Products have been promoted and sold at prices ranging from approximately $24 to $60.

98.     On information and belief, Cape Robbin promotes and sells its Accused Products as casual or lifestyle shoes primarily for women of all ages.

e.  **Relevant Consumers Are Susceptible to Confusion and Dilutive Associations Caused by Cape Robbin's Accused Products**

99.     Consumers of shoes like those at issue here are not likely to exercise great care in resolving likely confusion in their initial product interest, at the point of purchase, or in post-sale exposure. Even more sophisticated consumers are likely to experience cognitive dissonance regarding the source, affiliation, sponsorship, or association of Cape Robbin's Accused Products when confronted with promotions and sales of Cape Robbin's Accused Products.

100.    In the post-sale context, where actual or potential consumers of shoes may only see Cape Robbin's Accused Products on someone's feet in passing, consumers are also likely to mistake the source, affiliation, or sponsorship of Cape Robbin's Accused Products with Crocs and/or the Asserted Trademarks, or to associate the Accused Products with Crocs and/or the Asserted Trademarks.

f.  **Cape Robbin's Accused Products Are Likely to Cause Confusion and Dilutive Associations with Crocs or the Crocs 3D Marks**

101.    Due to the overwhelming similarities between Cape Robbin's Accused Products and the Crocs 3D Marks, and for the reasons set forth above, there is (a) a likelihood of confusion between Cape Robbin or its Accused Products, and Crocs or the Crocs 3D Marks, and/or (b) a likelihood of dilution between the same.

B.  **Crocsky**

102.    On information and belief, Crocsky ("Crocsky") is an unincorporated business with its principal place of business at 1401 Lavac St., Austin, TX 78701.

1.  **Crocsky's Background**

103.    On information and belief, Crocsky is an e-commerce business engaged solely in making knockoffs of Crocs' products, and does not appear to have any other legitimate business.

104. Crocsy sells its knockoff products through its website, crocsky.com. Despite the name, this website is not authorized by or otherwise affiliated with Crocs.

### 2. Crocsky's Accused Products

105. Crocsky's Accused Products include at least its "Crocsky Clog" and colorable imitations thereof. Representative images of Crocsky's Accused Products are shown below:



106. Crocsky has promoted and sold additional shoe models bearing the 3D Marks under various names and style descriptions. In particular, a screenshot of its website reveals the immensity of its infringement:



107.    The Accused Products are manufactured abroad and are imported into the United

States. Specifically, and as seen in the pictures above, the shoes have a label stating "Made in

China."

###    3.    Crocsky's Unfair Acts, Infringement, and Dilution of the Crocs 3D Marks

108.    For the reasons set forth below, these Accused Products infringe and are likely to

dilute Crocs 3D Marks.

**a.    Crocs Owned Protectable and Famous Trademark Rights Before Crocsky Promoted and Sold Accused Products**

109.    On information and belief, based on the extensive monitoring performed on Crocs' behalf described above, Crocsky began promoting and selling the Accused Products after the Asserted Registered Trademarks were registered and became well-recognized and famous, and after the Vamp Mark was first used in commerce.

110.    The '328 Registration and '875 Registration relevant to Crocsky's violations are also the subject of duly issued United States Trademark Registrations.

**b.    Crocsky's Accused Products Are Likely to Cause Confusion with the Crocs 3D Marks**

111.    As shown in Figure 5 below, Crocsky's Accused Products bear designs that are likely to cause confusion with the Crocs 3D Marks. In particular, the size, positioning, number, and shape of the holes on the horizontal portion of the upper of the Accused Products are confusingly similar to the 3D Marks. In addition, the Accused Products have a textured strip along the vertical portion of the upper with trapezoidal openings, which further contributes to the likelihood of consumer confusion. The Accused Products further have a textured strip on the heel of the shoe, and a decorative band along the length of the heel strap.

**FIGURE 5: Representative Images of Crocsky's Accused Products and the Crocs Asserted Trademarks**

| Accused Products | Registration No. 5,149,328 | Registration No. 5,273,875 |
| --- | --- | --- |
|  "Crocsky Clog" |  |  |

### c.      Crocsy Intended to Copy the Crocs 3D Marks and to Infringe and Dilute the Crocs 3D Marks

112.     Crocsky's intent to create associations with Crocs and to free ride on Crocs' goodwill is evident from at least the close similarities between Crocsky's Accused Products on the one hand, and the famous Crocs 3D Marks on the other hand. On information and belief, the overwhelming similarities are due to Crocsky's intentional copying. Crocsky's copying is also evidenced by its use of the Crocs Word Mark, as detailed below.

113.     Further, on information and belief, Crocsky is selling products through websites including etsy.com under a variety of aliases in order to evade detection, further evidencing its intent to copy the 3D Mark.

### d.      Crocsky Promotes and Sells Accused Products in Competition with Crocs' Promotion and Sales of Products Bearing the Asserted Trademarks

114.     On information and belief, Crocsky promotes and sells its Accused Products primarily through the Internet.

115.    On information and belief, Crocsky's Accused Products have been promoted and sold for approximately $30.

116.    On information and belief, Crocsky promotes and sells its Accused Products as a unisex casual or lifestyle shoe.

### e.    Relevant Consumers Are Susceptible to Confusion and Dilutive Associations Caused by Crocsky's Accused Products

117.    Consumers of shoes like those at issue here are not likely to exercise great care in resolving likely confusion in their initial product interest, at the point of purchase, or in post-sale exposure. Even more sophisticated consumers are likely to experience cognitive dissonance regarding the source, affiliation, sponsorship, or association of Crocsky's Accused Products when confronted with promotions and sales of Crocsky's Accused Products.

118.    Further, in the post-sale context, where actual or potential consumers of shoes may only see Crocsky's Accused Products on someone's feet in passing, consumers are also likely to mistake the source, affiliation, or sponsorship of Crocsky's Accused Products with Crocs and/or the Asserted Trademarks, or to associate the Accused Products with Crocs and/or the Asserted Trademarks.

### f.    Crocsky's Accused Products Are Likely to Cause Confusion and Dilutive Associations with Crocs or the Crocs 3D Marks

119.    Due to the overwhelming similarities between Crocsky's Accused Products and the Crocs 3D Marks, and for the reasons set forth above, there is (a) a likelihood of confusion between Crocsky or its Accused Products, and Crocs or the Crocs 3D Marks, and/or (b) a likelihood of dilution between the same.

    **4.**     **Crocsky's Unfair Acts, Infringement, and Dilution of the Crocs Word Mark**

120.    For the reasons set forth below, these Accused Products infringe and are likely to dilute the Crocs Word Mark.

    **a.**     **Crocs Owned Protectable and Famous Trademark Rights Before Crocsky Promoted and Sold Accused Products**

121.    On information and belief, based on the extensive monitoring performed on Crocs' behalf described above, Crocsky began promoting and selling the Accused Products after the Word Mark was registered and became well-recognized and famous.

122.    The Asserted Word Mark relevant to Crocsky's violations is also the subject of a duly issued United States Trademark Registration.

    **b.**     **Crocsky's Use of the Word Mark in Connection with its Sale of the Accused Products Is Likely to Cause Confusion with the Crocs Word Mark**

123.    Crocsky uses the Crocs Word Mark in connection with the marketing and sale of goods on its website. Crocsky uses the Crocs Word Mark both with respect to the names of its Accused Products and the marketing materials through which it sells the products.

124.    Most notably, the name "Crocksy" is a blatant attempt to ride on the goodwill consumers associate with Crocs' products.

125.    Further, Crocsky repeatedly uses the Word Mark "CROCS" throughout its website with respect to the marketing and sale of its "Crocsky Clogs" footwear products, and has an entire section of its website dedicated to (unauthorized) "CROCS", as shown below:



126.    Crocsky's use of this Word Mark is likely to cause confusion among consumers, who are likely to mistakenly believe that Crocs is the source of these Accused Products.

### c.    Crocsky Intended to Copy the Crocs Word Mark and to Infringe and Dilute the Crocs Word Mark

127.    Crocsky's intent to create associations with Crocs and to free ride on Crocs' goodwill is evident from their use of the word "CROCS" to sell footwear products. Crocsky is using the exact Word Mark without alteration on its website, and is barely modifying the Word Mark with respect to naming its Accused Products. On information and belief, this was intentionally done to copy the Crocs Word Mark.

128.    Further, on information and belief, Crocsky is selling products through websites, including etsy.com, under a variety of aliases in order to evade detection, further evidencing its intent to copy the Word Mark.

        **d.**      **Crocsky Promotes and Sells Accused Products in Competition with Crocs' Promotion and Sale of Products Bearing the Asserted Trademarks**

129.    On information and belief, Crocsky promotes and sells its Accused Products online through its own website, crocsky.com.

130.    On information and belief, Crocsky's Accused Products have been promoted and sold for approximately $30.

131.    On information and belief, Crocsky promotes and sells its Accused Products as a unisex casual or lifestyle shoe.

        **e.**      **Relevant Consumers Are Susceptible to Confusion and Dilutive Associations Caused by Crocsky's Accused Products**

132.    Consumers of shoes like those at issue here are not likely to exercise great care in resolving likely confusion in their initial product interest and at the point of purchase. Even more sophisticated consumers are likely to experience cognitive dissonance regarding the source, affiliation, sponsorship, or association of Crocsky's Accused Products when confronted with promotions and sales of Crocsky's Accused Products.

        **f.**      **Crocsky's Accused Products Are Likely to Cause Confusion and Dilutive Associations with Crocs or the Crocs Word Mark**

133.    For the reasons set forth above and due to Crocsky's outright copying of the Crocs Word Mark, there is (a) a likelihood of confusion between Crocsky or its Accused Products, and Crocs or the Crocs Word Mark, and/or (b) a likelihood of dilution between the same.

**C.**    **Fullbeauty Brandsd/b/a Kingsize**

134.    On information and belief, Fullbeauty Brands, Inc. d/b/a Kingsize ("Fullbeauty") is a Delaware corporation with its principal place of business at 1 New York Plaza, New York, NY 10004.

### 1. Fullbeauty's Background

135.    On information and belief, Fullbeauty was founded on or before October 31, 1994.

136.    Fullbeauty primarily sells its products through its website, kingsize.com.

### 2. Fullbeauty's Accused Products

137.    Fullbeauty's Accused Products include at least its "Kingsize Wide Width Rubber Clogs" footwear products and colorable imitations thereof. Representative images of Fullbeauty's Accused Products are shown below:

 

138.    On information and belief, Fullbeauty has promoted and sold additional shoe models bearing the 3D Marks under various names and style descriptions.

139.    The Accused Products are manufactured abroad and are imported into the United States. Specifically, and as seen in the pictures above, the shoes are branded with the mark "Made in China."

### 3. Fullbeauty's Unfair Acts, Infringement, and Dilution of the Crocs 3D Marks

140.    For the reasons set forth below, these Accused Products infringe and are likely to dilute the Crocs 3D Marks.

**a.  Crocs Owned Protectable and Famous Trademark Rights Before Fullbeauty Promoted and Sold Accused Products**

141.  On information and belief, based on the extensive monitoring performed on Crocs' behalf described above, Fullbeauty began promoting and selling the Accused Products after the Asserted Registered Trademarks were registered and became well-recognized and famous, and after the Vamp Mark was first used in commerce.

142.  The '328 Registration and '875 Registration relevant to Fullbeauty's violations are also the subject of duly issued United States Trademark Registrations.

**b.  Fullbeauty's Accused Products Are Likely to Cause Confusion with the Crocs 3D Marks**

143.  As shown in Figure 6 below, Fullbeauty's Accused Products bear designs that are likely to cause confusion with the Crocs 3D Marks. In particular, the size, positioning, number, and shape of the holes on the horizontal portion of the upper of the Accused Products are confusingly similar to the 3D Marks. In addition, the Accused Products have a textured strip along the vertical portion of the upper with trapezoidal openings, which further contributes to the likelihood of consumer confusion. The Accused Products further have a textured strip on the heel of the shoe, and a decorative band along the length of the heel strap.

**FIGURE 6: Representative Images of Fullbeauty's Accused Products and the Crocs Asserted Trademarks**

| Accused Products | Registration No. 5,149,328 | Registration No. 5,273,875 |
|---|---|---|

"Kingsize Wide Width Rubber Clogs"

### c. Fullbeauty Intended to Copy the Crocs 3D Marks and to Infringe and Dilute the Crocs 3D Marks

144.    Fullbeauty's intent to create associations with Crocs and to free ride on Crocs' goodwill is evident from at least the close similarities between Fullbeauty's Accused Products on the one hand, and the famous Crocs 3D Marks on the other hand. On information and belief, the overwhelming similarities are due to Fullbeauty's intentional copying.

### d. Fullbeauty Promotes and Sells Accused Products in Competition with Crocs' Promotion and Sales of Products Bearing the Asserted Trademarks

145.    On information and belief, Fullbeauty promotes and sells its Accused Products through the internet.

146.    On information and belief, Fullbeauty Accused Products have been promoted and sold for approximately $10.

147.    On information and belief, Fullbeauty promotes and sells its Accused Products as casual or lifestyle shoe designed primarily for adult men.

37

e.      **Relevant Consumers Are Susceptible to Confusion and Dilutive Associations Caused by Fullbeauty's Accused Products**

148.    Consumers of shoes like those at issue here are not likely to exercise great care in resolving likely confusion in their initial product interest, at the point of purchase, or in post-sale exposure. Even more sophisticated consumers are likely to experience cognitive dissonance regarding the source, affiliation, sponsorship, or association of Fullbeauty's Accused Products when confronted with promotions and sales of Fullbeauty's Accused Products.

149.    In the post-sale context, where actual or potential consumers of shoes may only see Fullbeauty's Accused Products on someone's feet in passing, consumers are also likely to mistake the source, affiliation, or sponsorship of Fullbeauty's Accused Products with Crocs and/or the Asserted Trademarks, or to associate the Accused Products with Crocs and/or the Asserted Trademarks.

f.      **Fullbeauty's Accused Products Are Likely to Cause Confusion and Dilutive Associations with Crocs or the Crocs 3D Marks**

150.    Due to the overwhelming similarities between Fullbeauty's Accused Products and the Crocs 3D Marks, and for the reasons set forth above, there is (a) a likelihood of confusion between Fullbeauty or its Accused Products, and Crocs or the Crocs 3D Marks, and/or (b) a likelihood of dilution between the same.

D.    **Hawkins**

151.    On information and belief, Hawkins Footwear, Sports, Military & Dixie Store ("Hawkins") is an unincorporated business with its principal place of business at 6083 New Jesup Hwy., Suite J, Brunswick, GA 31523.

1.    **Hawkins' Background**

152.    According to its website, Hawkins is a store that sells footwear, sports, military, and southern heritage products.

153.    Hawkins primarily sells its products through its store and website, www.hawkinsfootwear.com. On information and belief, Hawkins was founded around 2013.

### 2.      Hawkins' Accused Products

154.    Hawkins' Accused Products include at least its "Rubber Clogs" footwear products and colorable imitations thereof. Representative images of Hawkins' Accused Products are shown below:



155.    On information and belief, Hawkins has promoted and sold additional shoe models bearing the 3D Marks under various names and style descriptions.

156.    The Accused Products are manufactured abroad and are imported into the United States. Specifically, and as seen in the pictures above, the shoes have a label stating "Made in China."

### 3.      Hawkins' Unfair Acts, Infringement, and Dilution of the Crocs 3D Marks

157.    For the reasons set forth below, these Accused Products infringe and are likely to dilute the Crocs 3D Marks.

### a.   Crocs Owned Protectable and Famous Trademark Rights Before Hawkins Promoted and Sold Accused Products

158.    On information and belief, based on the extensive monitoring performed on Crocs' behalf described above, Hawkins began promoting and selling the Accused Products after the Asserted Registered Trademarks were registered and became well-recognized and famous, and after the Vamp Mark was first used in commerce.

159.    The '328 Registration and '875 Registration relevant to Hawkins' violations are also the subject of duly issued United States Trademark Registrations.

### b.   Hawkins' Accused Products Are Likely to Cause Confusion with the Crocs 3D Marks

160.    As shown in Figure 7 below, Hawkins' Accused Products bear designs that are likely to cause confusion with the Crocs 3D Marks. In particular, the size, positioning, number, and shape of the holes on the horizontal portion of the upper of the Accused Products are confusingly similar to the 3D Marks. In addition, the Accused Products have a textured strip along the vertical portion of the upper with trapezoidal openings, which further contributes to the likelihood of consumer confusion. The Accused Products further have a textured strip on the heel of the shoe, and a decorative band along the length of the heel strap.

**FIGURE 7: Representative Images of Hawkins' Accused Products and the Crocs Asserted Trademarks**

| Accused Products | Registration No. 5,149,328 | Registration No. 5,273,875 |
|---|---|---|
| | | |

"Kids Rubber Clogs"

### c. Hawkins Intended to Copy the Crocs 3D Marks and to Infringe and Dilute the Crocs 3D Marks

161.    Hawkins' intent to create associations with Crocs and to free ride on Crocs' goodwill is evident from at least the close similarities between Hawkins' Accused Products on the one hand, and the famous Crocs 3D Marks on the other hand. On information and belief, the overwhelming similarities are due to Hawkins' intentional copying.

### d. Hawkins Promotes and Sells Accused Products in Competition with Crocs' Promotion and Sales of Products Bearing the Asserted Trademarks

162.    On information and belief, Hawkins promotes and sells its Accused Products in its store and through the internet, as well as through its retail store.

163.    On information and belief, Hawkins' Accused Products have been promoted and sold for approximately $23 for two pairs, inclusive of shipping and taxes.

164.    On information and belief, Hawkins promotes and sells its Accused Products as a casual or lifestyle shoe designed primarily for men, women, and children.

e.      **Relevant Consumers Are Susceptible to Confusion and Dilutive Associations Caused by Hawkins' Accused Products**

165.    Consumers of shoes like those at issue here are not likely to exercise great care in resolving likely confusion in their initial product interest, at the point of purchase, or in post-sale exposure. Even more sophisticated consumers are likely to experience cognitive dissonance regarding the source, affiliation, sponsorship, or association of Hawkins' Accused Products when confronted with promotions and sales of Hawkins' Accused Products.

166.    In the post-sale context, where actual or potential consumers of shoes may only see Hawkins' Accused Products on someone's feet in passing, consumers are also likely to mistake the source, affiliation, or sponsorship of Hawkins' Accused Products with Crocs and/or the Asserted Trademarks, or to associate the Accused Products with Crocs and/or the Asserted Trademarks.

f.      **Hawkins' Accused Products Are Likely to Cause Confusion and Dilutive Associations with Crocs or the Crocs 3D Marks**

167.    Due to the overwhelming similarities between Hawkins' Accused Products and the Crocs 3D Marks, and for the reasons set forth above, there is (a) a likelihood of confusion between Hawkins Footwear or its Accused Products, and Crocs or the Crocs 3D Marks, and/or (b) a likelihood of dilution between the same.

E.      **Hobibear**

168.    On information and belief, Hobibear Shoes and Clothing Ltd. ("Hobibear") is a Colorado limited liability company with its principal place of business at 173 N. 17th Ct., Brighton, CO 80601.

1.      **Hobibear's Background**

169.    On information and belief, Hobibear was founded on or before March 1, 2021. *Id.*

170.     Hobibear primarily sells its products through e-commerce channels, including amazon.com.

### 2.     Hobibear's Accused Products

171.     Hobibear's Accused Products include at least its "Classic Graphic Garden Clogs Slip on Water Shoes" footwear products and colorable imitations thereof. Representative images of Hobibear's Accused Products are shown below:



172.     On information and belief, Hobibear has promoted and sold additional shoe models bearing the 3D Marks under various names and style descriptions.

173.     The Accused Products are manufactured abroad and are imported into the United States. Specifically, and as seen in the pictures above, the shoes have a label stating "Made in China."

### 3.     Hobibear's Unfair Acts, Infringement, and Dilution of the Crocs 3D Marks

174.     For the reasons set forth below, these Accused Products infringe and are likely to dilute the Crocs 3D Marks.

a.    **Crocs Owned Protectable and Famous Trademark Rights Before Hobibear Promoted and Sold Accused Products**

175.   On information and belief, based on the extensive monitoring performed on Crocs' behalf described above, Hobibear began promoting and selling the Accused Products after the Asserted Registered Trademarks were registered and became well-recognized and famous, and after the Vamp Mark was first used in commerce.

176.   The '328 Registration and '875 Registration relevant to Hobibear's violations are also the subject of duly issued United States Trademark Registrations.

b.    **Hobibear's Accused Products Are Likely to Cause Confusion with the Crocs 3D Marks**

177.   As shown in Figure 8 below, Hobibear's Accused Products bear designs that are likely to cause confusion with the Crocs 3D Marks. In particular, the size, positioning, number, and shape of the holes on the horizontal portion of the upper of the Accused Products are confusingly similar to the 3D Marks. In addition, the Accused Products have a textured strip along the vertical portion of the upper with trapezoidal openings, which further contributes to the likelihood of consumer confusion. The Accused Products further have a textured strip on the heel of the shoe, and a decorative band along the length of the heel strap.

**FIGURE 8: Representative Images of Hobibear's Accused Products and the Crocs Asserted Trademarks**

| Accused Products | Registration No. 5,149,328 | Registration No. 5,273,875 |
|---|---|---|
|  | | |

"Classic Graphic Garden Clogs Slip on Water Shoes"

### c.     Hobibear Intended to Copy the Crocs 3D Marks and to Infringe and Dilute the Crocs 3D Marks

178.     Hobibear's intent to create associations with Crocs and to free ride on Crocs' goodwill is evident from at least the close similarities between Hobibear's Accused Products on the one hand, and the famous Crocs 3D Marks on the other hand. On information and belief, the overwhelming similarities are due to Hobibear's intentional copying.

### d.     Hobibear Promotes and Sells Accused Products in Competition with Crocs' Promotion and Sales of Products Bearing the Asserted Trademarks

179.     On information and belief, Hobibear promotes and sells its Accused Products through the internet.

180.     On information and belief, Hobibear's Accused Products have been promoted and sold for approximately $19.

181.    On information and belief, Hobibear promotes and sells its Accused Products as a casual or lifestyle shoe designed primarily for men, women, and children.

> **e.    Relevant Consumers Are Susceptible to Confusion and Dilutive Associations Caused by Hobibear's Accused Products**

182.    Consumers of shoes like those at issue here are not likely to exercise great care in resolving likely confusion in their initial product interest, at the point of purchase, or in post-sale exposure. Even more sophisticated consumers are likely to experience cognitive dissonance regarding the source, affiliation, sponsorship, or association of Hobibear's Accused Products when confronted with promotions and sales of Hobibear's Accused Products.

183.    In the post-sale context, where actual or potential consumers of shoes may only see Hobibear's Accused Products on someone's feet in passing, consumers are also likely to mistake the source, affiliation, or sponsorship of Hobibear's Accused Products with Crocs and/or the Asserted Trademarks, or to associate the Accused Products with Crocs and/or the Asserted Trademarks.

> **f.    Hobibear's Accused Products Are Likely to Cause Confusion and Dilutive Associations with Crocs or the Crocs 3D Marks**

184.    Due to the overwhelming similarities between Hobibear's Accused Products and the Crocs 3D Marks, and for the reasons set forth above, there is (a) a likelihood of confusion between Hobibear or its Accused Products, and Crocs or the Crocs 3D Marks, and/or (b) a likelihood of dilution between the same.

### F.    Hobby Lobby

185.    On information and belief, Hobby Lobby Stores, Inc. ("Hobby Lobby") is a Oklahoma corporation with its principal place of business located at 7707 SW 44th St., Oklahoma City, OK 73179.

### 1.    Hobby Lobby's Background

186.    On information and belief, Hobby Lobby was founded in 1972. Hobby Lobby describes itself as having "more than 900 stores" and as "the largest privately owned arts-and-crafts retailer in the world with over 43,000 employees and operating in forty-seven states."

187.    Hobby Lobby sells its products through its retail store locations and through its website, hobbylobby.com.

### 2.    Hobby Lobby's Accused Products

188.    Hobby Lobby's Accused Products include at least its "White Foam Clog Ladies Shoes" footwear products and colorable imitations thereof. Representative images of Hobby Lobby's Accused Products are shown below:

 

189.    On information and belief, Hobby Lobby has promoted and sold additional shoe models bearing the 3D Marks under various names and style descriptions.

190.    The Accused Products are manufactured abroad and are imported into the United States. Specifically, and as seen in the pictures above, the shoes have a label stating "Made in China."

### 3.    Hobby Lobby's Unfair Acts, Infringement, and Dilution of the Crocs 3D Marks

191.    For the reasons set forth below, these Accused Products infringe and are likely to dilute the Crocs 3D Marks.

### a.    Crocs Owned Protectable and Famous Trademark Rights Before Hobby Lobby Promoted and Sold Accused Products

192.    On information and belief, based on the extensive monitoring performed on Crocs' behalf described above, Hobby Lobby began promoting and selling the Accused Products after the Asserted Registered Trademarks were registered and became well-recognized and famous, and after the Vamp Mark was first used in commerce.

193.    The '328 Registration and '875 Registration relevant to Hobby Lobby's violations are also the subject of duly issued United States Trademark Registrations.

### b.    Hobby Lobby's Accused Products Are Likely to Cause Confusion with the Crocs 3D Marks

194.    As shown in Figure 9 below, Hobby Lobby's Accused Products bear designs that are likely to cause confusion with the Crocs 3D Marks. In particular, the size, positioning, number, and shape of the holes on the horizontal portion of the upper of the Accused Products are confusingly similar to the 3D Marks. In addition, the Accused Products have a textured strip along the vertical portion of the upper with trapezoidal openings, which further contributes to the likelihood of consumer confusion. The Accused Products further have a textured strip on the heel of the shoe, and a decorative band along the length of the heel strap.

**FIGURE 9: Representative Images of Hobby Lobby's Accused Products and the Crocs Asserted Trademarks**

| Accused Products | Registration No. 5,149,328 | Registration No. 5,273,875 |
|---|---|---|
| | | |
| "White Foam Clog Ladies Shoes" | | |

### c. Hobby Lobby Intended to Copy the Crocs 3D Marks and to Infringe and Dilute the Crocs 3D Marks

195.    Hobby Lobby's intent to create associations with Crocs and to free ride on Crocs' goodwill is evident from at least the close similarities between Hobby Lobby's Accused Products on the one hand, and the famous Crocs 3D Marks on the other hand. On information and belief, the overwhelming similarities are due to Hobby Lobby's intentional copying. Hobby Lobby's copying is also evidenced by its use of the Crocs Word Mark, as detailed below.

### d. Hobby Lobby Promotes and Sells Accused Products in Competition with Crocs' Promotion and Sales of Products Bearing the Asserted Trademarks

196.    On information and belief, Hobby Lobby promotes and sells its Accused Products at retail stores in the United States and through the internet through its website, hobbylobby.com.

197.    On information and belief, Hobby Lobby's Accused Products have been promoted and sold for approximately $12.

198.    On information and belief, Hobby Lobby promotes and sells its Accused Products as a casual or lifestyle shoe designed primarily for people of all ages.

**e.** **Relevant Consumers Are Susceptible to Confusion and Dilutive Associations Caused by Hobby Lobby's Accused Products**

199. Consumers of shoes like those at issue here are not likely to exercise great care in resolving likely confusion in their initial product interest, at the point of purchase, or in post-sale exposure. Even more sophisticated consumers are likely to experience cognitive dissonance regarding the source, affiliation, sponsorship, or association of Hobby Lobby's Accused Products when confronted with promotions and sales of Hobby Lobby's Accused Products.

200. In the post-sale context, where actual or potential consumers of shoes may only see Hobby Lobby's Accused Products on someone's feet in passing, consumers are also likely to mistake the source, affiliation, or sponsorship of Hobby Lobby's Accused Products with Crocs and/or the Asserted Trademarks, or to associate the Accused Products with Crocs and/or the Asserted Trademarks.

**f.** **Hobby Lobby's Accused Products Are Likely to Cause Confusion and Dilutive Associations with Crocs or the Crocs 3D Marks**

201. Due to the overwhelming similarities between Hobby Lobby's Accused Products and the Crocs 3D Marks, and for the reasons set forth above, there is (a) a likelihood of confusion between Hobby Lobby or its Accused Products, and Crocs or the Crocs 3D Marks, and/or (b) a likelihood of dilution between the same.

**4.** **Hobby Lobby's Unfair Acts, Infringement, and Dilution of the Crocs Word Mark**

202. For the reasons set forth below, these Accused Products infringe and are likely to dilute Crocs Word Mark.

> **a.     Crocs Owned Protectable and Famous Trademark Rights Before Hobby Lobby Promoted and Sold Accused Products**

203.    On information and belief, based on the extensive monitoring performed on Crocs' behalf described above, Hobby Lobby began promoting and selling the Accused Products after the Word Mark was registered and became well-recognized and famous.

204.    The Asserted Word Mark relevant to Hobby Lobby's violations is also the subject of a duly issued United States Trademark Registration.

> **b.     Hobby Lobby's Use of the Word Mark in Connection with its Sale of the Accused Products Is Likely to Cause Confusion with the Crocs Word Mark**

205.    Hobby Lobby uses the Crocs Word Mark in connection with the marketing and sale of goods on its website. Hobby Lobby uses the Crocs Word Mark both with respect to the names of its Accused Products and the marketing materials through which it sells the products.

206.    For example, Hobby Lobby uses the Word Mark "CROCS" with respect to the marketing and sale of its "White Foam Clog Ladies Shoes" footwear products. Hobby Lobby uses the Word Mark on the packaging. A representative image is shown below:



207.    Hobby Lobby's use of this Word Mark is likely to cause confusion among consumers, who are likely to mistakenly believe that Crocs is the source of these Accused Products.

c. **Hobby Lobby Intended to Copy the Crocs Word Mark and to Infringe and Dilute the Crocs Word Mark**

208. Hobby Lobby's intent to create associations with Crocs and to free ride on Crocs' goodwill is evident from their use of the word "CROCS" to sell footwear products. Hobby Lobby is using the exact Word Mark without alteration. On information and belief, this was intentionally done to copy Crocs Word Mark.

d. **Hobby Lobby Promotes and Sells Accused Products in Competition with Crocs' Promotion and Sale of Products Bearing the Asserted Trademarks**

209. On information and belief, Hobby Lobby promotes and sells its Accused Products online through its own website, hobbylobby.com, as well as through a variety of brick-and-mortar stores.

210. On information and belief, Hobby Lobby's Accused Products have been promoted and sold for approximately $12.

211. On information and belief, Hobby Lobby promotes and sells its Accused Products as casual or lifestyle shoes primarily for women of all ages.

e. **Relevant Consumers Are Susceptible to Confusion and Dilutive Associations Caused by Hobby Lobby's Accused Products**

212. Consumers of shoes like those at issue here are not likely to exercise great care in resolving likely confusion in their initial product interest or at the point of purchase. Even more sophisticated consumers are likely to experience cognitive dissonance regarding the source, affiliation, sponsorship, or association of Hobby Lobby's Accused Products when confronted with promotions and sales of Hobby Lobby's Accused Products.

> **f.      Hobby Lobby's Accused Products Are Likely to Cause Confusion and Dilutive Associations with Crocs or the Crocs Word Mark**

213.    For the reasons set forth above and due to Hobby Lobby's outright copying of the Crocs Word Mark, there is (a) a likelihood of confusion between Hobby Lobby or its Accused Products, and Crocs or the Crocs Word Mark, and/or (b) a likelihood of dilution between the same.

**G.      Ink Tee**

214.    On information and belief, Ink Tee ("Ink Tee") is an unincorporated business with its principal place of business at 811 Wilshire Blvd., Los Angeles, CA 90017.

**1.      Ink Tee's Background**

215.    On information and belief, Ink Tee is an e-commerce business founded in 2017 that focuses primarily on selling a variety of clothing, including unisex footwear products. These products are sold primarily through the website, inkteeshop.com. On information and belief, this website is owned and operated by Ink Tee. *Id.*

**2.      Ink Tee's Accused Products**

216.    Ink Tee's Accused Products include at least its "Crocs Clog Shoes" footwear products and colorable imitations thereof. Representative images of Ink Tee's Accused Products are shown below:

 

217.    The Accused Products are manufactured abroad and are imported into the United States. Specifically, and as seen in the pictures above, the shoes have a label stating "Made in China."

### 3.    Ink Tee's Unfair Acts, Infringement, and Dilution of the Crocs 3D Marks

218.    For the reasons set forth below, these Accused Products infringe and are likely to dilute the Crocs 3D Marks.

#### a.    Crocs Owned Protectable and Famous Trademark Rights Before Ink Tee Promoted and Sold Accused Products

219.    On information and belief, based on the extensive monitoring performed on Crocs' behalf described above, Ink Tee began promoting and selling the Accused Products after the Asserted Registered Trademarks were registered and became well-recognized and famous, and after the Vamp Mark was first used in commerce.

220.    The '328 Registration and '875 Registration relevant to Ink Tee's violations are also the subject of duly issued United States Trademark Registrations.

      **b.**    **Ink Tee's Accused Products Are Likely to Cause Confusion with the Crocs 3D Marks**

221.    As shown in Figure 10 below, Ink Tee's Accused Products bear designs that are likely to cause confusion with the Crocs 3D Marks. In particular, the size, positioning, number, and shape of the holes on the horizontal portion of the upper of the Accused Products are confusingly similar to the 3D Marks. In addition, the Accused Products have a textured strip along the vertical portion of the upper with trapezoidal openings, which further contributes to the likelihood of consumer confusion. The Accused Products further have a textured strip on the heel of the shoe, and a decorative band along the length of the heel strap.

**FIGURE 10: Representative Images of Ink Tee's Accused Products and the Crocs Asserted Trademarks**



| Accused Products | Registration No. 5,149,328 | Registration No. 5,273,875 |
| --- | --- | --- |

"Crocs Clog Shoes"

      **c.**       **Ink Tee Intended to Copy the Crocs 3D Marks and to Infringe and Dilute the Crocs 3D Marks**

222.    Ink Tee's intent to create associations with Crocs and to free ride on Crocs' goodwill is evident from at least the close similarities between Ink Tee's Accused Products on the one hand, and the famous Crocs 3D Marks on the other hand. On information and belief, the overwhelming similarities are due to Ink Tee's intentional copying.

223.    Additionally, Ink Tee maintains a blog on its website that suggests there is an affiliation between Crocs and Ink Tee, even though no such affiliation exists. A screenshot of this blog is reproduced below:

BLOG

## 5 Reasons Why Busch Light Beer Crocs Clog Shoes Is a Must-Have Item in Your Closet

POSTED ON MARCH 22, 2021 BY MIKE



**C**rocs is an American footwear brand inspired by the amphibious qualities of crocodiles. Crocs' purpose is to protect feet on land and in water, much like the life of all amphibians. People treat crocs as frenemies of the feet. While they look the way they do, they are some of the most comfortable footwear found on the market.

Once you own a pair of Busch light crocs, you just cannot get rid of them. Wearing Crocs has become a simpler way of taking extra care of your feet and is slowly garnering the deserved attention. Let's see why Crocs matter.

224. Similar posts falsely suggesting an affiliation between Crocs and Ink Tee may be found at inkteeshop.com/blog.

225. Furthermore, Ink Tee uses a variety of aliases to sell its Accused Products through websites such as etsy.com. On information and belief, Ink Tee does this to evade detection of its infringement. In Figure 11 below, representative images of listings on inkteeshop.com are

compared against similar listings on etsy.com with the names of the purported sellers listed on

etsy.com:

**FIGURE 11: Representative Images of Ink Tee's Accused Products and its Products Listed under various Aliases on Etsy.com**



| Ink Tee Image | Etsy Image | Name of the Purported Etsy Seller |
|---|---|---|
| | | O7Roseshop |
| | | MarcDanielStore US |

| Ink Tee Image | Etsy Image | Name of the Purported Etsy Seller |
|---|---|---|
|  | | BradleyJMaier |

226.    As seen above, the Etsy sellers "O7Roseshop" and "MarcDanielStoreUS" include photographs in their listings on etsy.com that are similar or identical to product photographs listed on inkteeshop.com. Similarly, the Etsy seller "BradleyJMaier" uses the same background to display its shoes on etsy.com as a background featured in a listing on inkteeshop.com.

227.    Moreover, and as can be seen in the images above, Ink Tee's Accused Products incorporate a variety of different brands including "Busch Light," "Oakland Raiders," and "Coors Light," which on information and belief are all protected by various third-party trademarks. On information and belief, Ink Tee does not have authorization from these third-party trademark holders to use these trademarks, further evidencing Ink Tee's intent to copy the 3D Mark.

228.    Ink Tee's copying is also evidenced by its use of the Crocs Word Mark, as detailed below.

          **d.**      **Ink Tee Promotes and Sells Accused Products in Competition with Crocs' Promotion and Sales of Products Bearing the Asserted Trademarks**

229.    On information and belief, Ink Tee promotes and sells its Accused Products Primarily through the internet.

230.    On information and belief, Ink Tee's Accused Products have been promoted and sold for approximately $36.

231.     On information and belief, Ink Tee promotes and sells its Accused Products as a casual or lifestyle shoe primarily for people of all ages.

          **e.       Relevant Consumers Are Susceptible to Confusion and Dilutive Associations Caused by Ink Tee's Accused Products**

232.    Consumers of shoes like those at issue here are not likely to exercise great care in resolving likely confusion in their initial product interest, at the point of purchase, or in post-sale exposure. Even more sophisticated consumers are likely to experience cognitive dissonance regarding the source, affiliation, sponsorship, or association of Ink Tee's Accused Products when confronted with promotions and sales of Ink Tee's Accused Products.

233.    Further, in the post-sale context, where actual or potential consumers of shoes may only see Ink Tee's Accused Products on someone's feet in passing, consumers are also likely to mistake the source, affiliation, or sponsorship of Ink Tee's Accused Products with Crocs and/or the Asserted Trademarks, or to associate the Accused Products with Crocs and/or the Asserted Trademarks.

          **f.       Ink Tee's Accused Products Are Likely to Cause Confusion and Dilutive Associations with Crocs or the Crocs 3D Marks**

234.    Due to the overwhelming similarities between Ink Tee's Accused Products and the Crocs 3D Marks, and for the reasons set forth above, there is (a) a likelihood of confusion between Ink Tee or its Accused Products, and Crocs or the Crocs 3D Marks, and/or (b) a likelihood of dilution between the same.

       **4.**      **Ink Tee's Unfair Acts, Infringement, and Dilution of the Crocs Word Mark**

235.    For the reasons set forth below, these Accused Products infringe and are likely to dilute Crocs Word Mark.

       **a.**      **Crocs Owned Protectable and Famous Trademark Rights Before Ink Tee Promoted and Sold Accused Products**

236.    On information and belief, based on the extensive monitoring performed on Crocs' behalf described above, Ink Tee began promoting and selling the Accused Products after the Word Mark was registered and became well-recognized and famous.

237.    The Asserted Word Mark relevant to Ink Tee's violations is also the subject of a duly issued United States Trademark Registration.

       **b.**      **Ink Tee's Use of the Word Mark in Connection with its Sale of the Accused Products Is Likely to Cause Confusion with the Crocs Word Mark**

238.    Ink Tee uses the Crocs Word Mark in connection with the marketing and sale of goods on its website. Ink Tee uses the Crocs Word Mark both with respect to the names of its Accused Products and the marketing materials through which it sells the products.

239.    For example, Ink Tee uses the Word Mark "Croc" with respect to the marketing and sale of its "Crocs Clog Shoes" footwear products. Ink Tee uses the Word Mark both for the name of its shoe, as well as on multiple places on its website. Further, Ink Tee uses the term "CROCS" in the packaging for its products, as shown below:



240.    Ink Tee's use of this Word Mark is likely to cause confusion among consumers, who are likely to mistakenly believe that Crocs is the source of these Accused Products.

### c.    Ink Tee Intended to Copy the Crocs Word Mark and to Infringe and Dilute the Crocs Word Mark

241.    Ink Tee's intent to create associations with Crocs and to free ride on Crocs' goodwill is evident from its use of the word "CROCS" to sell footwear products. Ink Tee is using the exact Word Mark without alteration on its website, and is barely modifying the Word Mark with respect to naming its Accused Products. On information and belief, this was intentionally done to copy Crocs Word Mark.

242.    Additionally, and as discussed above, Ink Tee maintains a blog on its website that suggests there is an affiliation between Crocs and Ink Tee, even though no such affiliation exists. A screenshot of this blog is reproduced below:

BLOG

## 5 Reasons Why Busch Light Beer Crocs Clog Shoes Is a Must-Have Item in Your Closet

POSTED ON MARCH 22, 2021 BY MIKE



C rocs is an American footwear brand inspired by the amphibious qualities of crocodiles. Crocs' purpose is to protect feet on land and in water, much like the life of all amphibians. People treat crocs as frenemies of the feet. While they look the way they do, they are some of the most comfortable footwear found on the market.

Once you own a pair of Busch light crocs, you just cannot get rid of them. Wearing Crocs has become a simpler way of taking extra care of your feet and is slowly garnering the deserved attention. Let's see why Crocs matter.

243.    Similar posts falsely suggesting an affiliation between Crocs and Ink Tee can be found at inkteeshop.com/blog.

244.    Moreover, on information and belief, Ink Tee is selling products through websites including etsy.com under a variety of aliases in order to evade detection, further evidencing its intent to copy the Word Mark.

245.    Further, for the reasons set forth above with respect to the 3D Mark, it appears that Ink Tee is using third-party trademarks without permission, further evidencing its intent to copy the Crocs Word Mark.

**d.      Ink Tee Promotes and Sells Accused Products in Competition with Crocs' Promotion and Sale of Products Bearing the Asserted Trademarks**

246.    On information and belief, Ink Tee promotes and sells its Accused Products online through its own website, inkteeshop.com.

247.    On information and belief, Ink Tee's Accused Products have been promoted and sold for approximately $36.

248.    On information and belief, Ink Tee promotes and sells its Accused Products as casual or lifestyle shoes primarily for women of all ages.

**e.      Relevant Consumers Are Susceptible to Confusion and Dilutive Associations Caused by Ink Tee's Accused Products**

249.    Consumers of shoes like those at issue here are not likely to exercise great care in resolving likely confusion in their initial product interest or at the point of purchase. Even more sophisticated consumers are likely to experience cognitive dissonance regarding the source, affiliation, sponsorship, or association of Ink Tee's Accused Products when confronted with promotions and sales of Ink Tee's Accused Products.

**f.      Ink Tee's Accused Products Are Likely to Cause Confusion and Dilutive Associations with Crocs or the Crocs Word Mark**

250.    For the reasons set forth above and due to Ink Tee's outright copying of the Crocs Word Mark, there is (a) a likelihood of confusion between Ink Tee or its Accused Products, and Crocs or the Crocs Word Mark, and/or (b) a likelihood of dilution between the same.

### H.    Loeffler Randall

251.    On information and belief, Loeffler Randall Inc. ("Loeffler Randall") is a New York corporation with its principal place of business at 588 Broadway, Ste 1203, New York, NY 10012.

#### 1.    Loeffler Randall's Background

252.    On information and belief, Loeffler Randall was founded on or before April 8, 2004. According to its website, Loeffler Randall has been designing and selling shoes since 2004.

253.    Loeffler Randall primarily sells its products through its retail store in New York City, as well as its website, loefflerrandall.com.

#### 2.    Loeffler Randall's Accused Products

254.    Loeffler Randall's Accused Products include at least its "Ezra Black Rubber Clog" footwear products and colorable imitations thereof. Representative images of Loeffler Randall's Accused Products are shown below:

 

255.    On information and belief, Loeffler Randall has promoted and sold additional shoe models bearing the 3D Marks under various names and style descriptions.

256.   The Accused Products are manufactured abroad and are imported into the United States. Specifically, and as seen in the pictures above, the shoes are branded with the mark "Made in Brazil."

### 3.   Loeffler Randall's Unfair Acts, Infringement, and Dilution of the Crocs 3D Marks

257.   For the reasons set forth below, these Accused Products infringe and are likely to dilute Crocs 3D Marks.

### a.   Crocs Owned Protectable and Famous Trademark Rights Before Loeffler Randall Promoted and Sold Accused Products

258.   On information and belief, based on the extensive monitoring performed on Crocs' behalf described above, Loeffler Randall began promoting and selling the Accused Products after the Asserted Registered Trademarks were registered and became well-recognized and famous, and after the Vamp Mark was first used in commerce.

259.   The '328 Registration and '875 Registration relevant to Loeffler Randall's violations are also the subject of duly issued United States Trademark Registrations.

### b.   Loeffler Randall's Accused Products Are Likely to Cause Confusion with the Crocs 3D Marks

260.   As shown in Figure 12 below, Loeffler Randall's Accused Products bear designs that are likely to cause confusion with the Crocs 3D Marks. In particular, the size, positioning, number, and shape of the holes on the horizontal portion of the upper of the Accused Products are confusingly similar to the 3D Marks. In addition, the Accused Products have a textured strip along the vertical portion of the upper with trapezoidal openings, which further contributes to the likelihood of consumer confusion. The Accused Products further have a textured strip on the heel of the shoe, and a decorative band along the length of the heel strap.

**FIGURE 12: Representative Images of Loeffler Randall's Accused Products and the Crocs Asserted Trademarks**

| Accused Products | Registration No. 5,149,328 | Registration No. 5,273,875 |
|---|---|---|
| | | |
| "Ezra Black Rubber Clog" | | |

### c.   Loeffler Randall Intended to Copy the Crocs 3D Marks and to Infringe and Dilute the Crocs 3D Marks

261.    Loeffler Randall's intent to create associations with Crocs and to free ride on Crocs' goodwill is evident from at least the close similarities between Loeffler Randall's Accused Products on the one hand, and the famous Crocs 3D Marks on the other hand. On information and belief, the overwhelming similarities are due to Loeffler Randall's intentional copying.

### d.   Loeffler Randall Promotes and Sells Accused Products in Competition with Crocs' Promotion and Sales of Products Bearing the Asserted Trademarks

262.    On information and belief, Loeffler Randall promotes and sells its Accused Products at its retail store and through the Internet.

263.    On information and belief, Loeffler Randall Accused Products have been promoted and sold for approximately $125.

264.    On information and belief, Loeffler Randall promotes and sells its Accused Products as casual or lifestyle shoe designed primarily for adult women.

e.      **Relevant Consumers Are Susceptible to Confusion and Dilutive Associations Caused by Loeffler Randall's Accused Products**

265.    Consumers of shoes like those at issue here are not likely to exercise great care in resolving likely confusion in their initial product interest, at the point of purchase, or in post-sale exposure. Even more sophisticated consumers are likely to experience cognitive dissonance regarding the source, affiliation, sponsorship, or association of Loeffler Randall's Accused Products when confronted with promotions and sales of Loeffler Randall's Accused Products.

266.    In the post-sale context, where actual or potential consumers of shoes may only see Loeffler Randall's Accused Products on someone's feet in passing, consumers are also likely to mistake the source, affiliation, or sponsorship of Loeffler Randall's Accused Products with Crocs and/or the Asserted Trademarks, or to associate the Accused Products with Crocs and/or the Asserted Trademarks.

f.      **Loeffler Randall's Accused Products Are Likely to Cause Confusion and Dilutive Associations with Crocs or the Crocs 3D Marks**

267.    Due to the overwhelming similarities between Loeffler Randall's Accused Products and the Crocs 3D Marks, and for the reasons set forth above, there is (a) a likelihood of confusion between Loeffler Randall or its Accused Products, and Crocs or the Crocs 3D Marks, and/or (b) a likelihood of dilution between the same.

**I.      Walmart and Maxhouse Rise**

268.    On information and belief, Maxhouse Rise Ltd. ("Maxhouse Rise") is a Hong Kong corporation with its principal place of business at Flat A, 25/F, United Centre, 95 Queensway, Hong Kong.

269. On information and belief, Walmart Inc. is a Delaware Corporation with its principal place of business at 702 S.W. 8th St., Bentonville, AR 72716. Walmart Inc. and Maxhouse Rise are hereinafter collectively referred to as "Walmart".

### 1. Maxhouse Rise's Background

270. On information and belief, Maxhouse Rise was founded as a shoe manufacturer in or around 1995.

271. Maxhouse Rise sells its shoes through American retailers including through walmart.com.

### 2. Walmart Inc.'s Background

272. On information and belief, Walmart Inc. was first incorporated in 1969. It sells products both online through its website, walmart.com and through its network of over 4000 retail stores in the United States.

### 3. Walmart's Accused Products

273. Walmart's Accused Products include at least its "Sandal" footwear products and colorable imitations thereof. Walmart sells these products under a variety of names, including "Time and True," "George," and "Wonder Nation." Representative images of Walmart's Accused Products are shown below:



274.    On information and belief, Walmart has promoted and sold additional shoe models bearing the 3D Marks under various names and style descriptions.

275.    The Accused Products are manufactured abroad and are imported into the United States. Specifically, and as seen in the pictures above, the shoes are branded with the mark "Made in China."

### 4.    Walmart's Unfair Acts, Infringement, and Dilution of the Crocs 3D Marks

276.    For the reasons set forth below, these Accused Products infringe and are likely to dilute Crocs 3D Marks.

#### a.    Crocs Owned Protectable and Famous Trademark Rights Before Walmart Promoted and Sold Accused Products

277.    On information and belief, based on the extensive monitoring performed on Crocs' behalf described above, Walmart began promoting and selling the Accused Products after the Asserted Registered Trademarks were registered and became well-recognized and famous, and after the Vamp Mark was first used in commerce.

278.    The '328 Registration and '875 Registration relevant to Walmart's violations are also the subject of duly issued United States Trademark Registrations.

#### b.    Walmart's Accused Products Are Likely to Cause Confusion with the Crocs 3D Marks

279.    As shown in Figure 13 below, Walmart's Accused Products bear designs that are likely to cause confusion with the Crocs 3D Marks. In particular, the size, positioning, number, and shape of the holes on the horizontal portion of the upper of the Accused Products are confusingly similar to the 3D Marks. In addition, the Accused Products have a textured strip along the vertical portion of the upper with trapezoidal openings, which further contributes to the

likelihood of consumer confusion. The Accused Products further have a textured strip on the heel of the shoe, and a decorative band along the length of the heel strap.

**FIGURE 13: Representative Images of Walmart's Accused Products and the Crocs Asserted Trademarks**

| Accused Products | Registration No. 5,149,328 | Registration No. 5,273,875 |
|---|---|---|



"Sandal"

### c. Walmart Intended to Copy the Crocs 3D Marks and to Infringe and Dilute the Crocs 3D Marks

280. Walmart 's intent to create associations with Crocs and to free ride on Crocs' goodwill is evident from at least the close similarities between Walmart's Accused Products on the one hand, and the famous Crocs 3D Marks on the other hand. On information and belief, the overwhelming similarities are due to Walmart 's intentional copying.

### d. Walmart Promotes and Sells Accused Products in Competition with Crocs' Promotion and Sales of Products Bearing the Asserted Trademarks

281. On information and belief, Walmart promotes and sells its Accused Products through Walmart stores and on the Internet at walmart.com.

282. On information and belief, Walmart Accused Products have been promoted and sold for approximately $10.

283.     On information and belief, Walmart  promotes and sells its Accused Products as casual or lifestyle shoe designed primarily for adult men and women.

   **e.**   **Relevant Consumers Are Susceptible to Confusion and Dilutive Associations Caused by Walmart 's Accused Products**

284.     Consumers of shoes like those at issue here are not likely to exercise great care in resolving likely confusion in their initial product interest, at the point of purchase, or in post-sale exposure. Even more sophisticated consumers are likely to experience cognitive dissonance regarding the source, affiliation, sponsorship, or association of Walmart 's Accused Products when confronted with promotions and sales of Walmart's Accused Products.

285.     In the post-sale context, where actual or potential consumers of shoes may only see Walmart's Accused Products on someone's feet in passing, consumers are also likely to mistake the source, affiliation, or sponsorship of Walmart's Accused Products with Crocs and/or the Asserted Trademarks, or to associate the Accused Products with Crocs and/or the Asserted Trademarks.

   **f.**   **Walmart's Accused Products Are Likely to Cause Confusion and Dilutive Associations with Crocs or the Crocs 3D Marks**

286.     Due to the overwhelming similarities between Walmart's Accused Products and the Crocs 3D Marks, and for the reasons set forth above, there is (a) a likelihood of confusion between Walmart or its Accused Products, and Crocs or the Crocs 3D Marks, and/or (b) a likelihood of dilution between the same.

**J.**   **PW Shoes a/k/a P&W Shoes**

287.     On information and belief, PW Shoes, Inc. a/ka/ P&W Shoes ("PW") is a New York corporation with its principal place of business at 5830 Grand Ave, 3a, Maspeth, NY 11378.

### 1.      PW's Background

288.    On information and belief, PW was founded on or before January 10, 2011. According to its website, PW is an "industry leader in footwear wholesale based out of New York City."

289.    PW primarily sells its products through its website, pwshoes.com, as well as other websites such as walmart.com.

### 2.      PW's Accused Products

290.    PW's Accused Products include at least its "Spring Summer Toddler Boys' Slingback Sandal Clogs" footwear products and colorable imitations thereof. Representative images of PW's Accused Products are shown below:

 

291.    On information and belief, PW has promoted and sold additional shoe models bearing the 3D Marks under various names and style descriptions.

292.    The Accused Products are manufactured abroad and are imported into the United States. Specifically, and as seen in the pictures above, the shoes are identified as being "Made in China."

### 3. PW's Unfair Acts, Infringement, and Dilution of the Crocs 3D Marks

293.    For the reasons set forth below, these Accused Products infringe and are likely to dilute Crocs 3D Marks.

#### a. Crocs Owned Protectable and Famous Trademark Rights Before PW Promoted and Sold Accused Products

294.    On information and belief, based on the extensive monitoring performed on Crocs' behalf described above, PW began promoting and selling the Accused Products after the Asserted Registered Trademarks were registered and became well-recognized and famous, and after the Vamp Mark was first used in commerce.

295.    The '328 Registration and '875 Registration relevant to PW's violations are also the subject of duly issued United States Trademark Registrations.

#### b. PW's Accused Products Are Likely to Cause Confusion with the Crocs 3D Marks

296.    As shown in Figure 14 below, PW's Accused Products bear designs that are likely to cause confusion with the Crocs 3D Marks. In particular, the size, positioning, number, and shape of the holes on the horizontal portion of the upper of the Accused Products are confusingly similar to the 3D Marks. In addition, the Accused Products have a textured strip along the vertical portion of the upper with trapezoidal openings, which further contributes to the likelihood of consumer confusion. The Accused Products further have a textured strip on the heel of the shoe, and a decorative band along the length of the heel strap.

**FIGURE 14: Representative Images of PW's Accused Products and the Crocs Asserted Trademarks**

| Accused Products | Registration No. 5,149,328 | Registration No. 5,273,875 |
| --- | --- | --- |
| "Spring Summer Toddler Boys' Slingback Sandal Clogs" | | |

#### c. PW Intended to Copy the Crocs 3D Marks and to Infringe and Dilute the Crocs 3D Marks

297. PW's intent to create associations with Crocs and to free ride on Crocs' goodwill is evident from at least the close similarities between PW's Accused Products on the one hand, and the famous Crocs 3D Marks on the other hand. On information and belief, the overwhelming similarities are due to PW's intentional copying.

#### d. PW Promotes and Sells Accused Products in Competition with Crocs' Promotion and Sales of Products Bearing the Asserted Trademarks

298. On information and belief, PW promotes and sells its Accused Products through the Internet, including through walmart.com.

299. On information and belief, PW's Accused Products have been promoted and sold for approximately $15.

300. On information and belief, PW promotes and sells its Accused Products as casual or lifestyle shoe designed primarily for toddler boys.

e.  **Relevant Consumers Are Susceptible to Confusion and Dilutive Associations Caused by PW's Accused Products**

301.  Consumers of shoes like those at issue here are not likely to exercise great care in resolving likely confusion in their initial product interest, at the point of purchase, or in post-sale exposure. Even more sophisticated consumers are likely to experience cognitive dissonance regarding the source, affiliation, sponsorship, or association of PW's Accused Products when confronted with promotions and sales of PW's Accused Products.

302.  In the post-sale context, where actual or potential consumers of shoes may only see PW's Accused Products on someone's feet in passing, consumers are also likely to mistake the source, affiliation, or sponsorship of PW's Accused Products with Crocs and/or the Asserted Trademarks, or to associate the Accused Products with Crocs and/or the Asserted Trademarks.

f.  **PW's Accused Products Are Likely to Cause Confusion and Dilutive Associations with Crocs or the Crocs 3D Marks**

303.  Due to the overwhelming similarities between PW's Accused Products and the Crocs 3D Marks, and for the reasons set forth above, there is (a) a likelihood of confusion between PW or its Accused Products, and Crocs or the Crocs 3D Marks, and/or (b) a likelihood of dilution between the same.

**K.    Yoki**

304.  On information and belief, Yoki Fashion International LLC ("Yoki") is a New York limited liability company with a principal place of business at 1410 Broadway, Suite 1005, New York, NY 10018.

**1.    Yoki's Background**

305.  Yoki describes itself as a wholesaler that provides footwear products for women and children.

76

306. On information and belief, Yoki primarily sells Accused Products through retailers, including Shoe-Nami, who in turn sell Accused Products online and at brick-and-mortar Stores. Yoki also sells a limited number of products in direct-to-consumer sales through its website, yokifashioninc.com, as well as through other retailers, including shoeshowmega.com.

### 2. Yoki's Accused Products

307. Yoki's Accused Products include at least its "Lolli" footwear products and colorable imitations thereof. Representative images of Lolli's Accused Products are shown below:







308.    On information and belief, Yoki has promoted and sold additional shoe models bearing the 3D Marks under various names and style descriptions.

309.    The Accused Products are manufactured abroad and are imported into the United States. Specifically, and as seen in the pictures above, the shoes have a label stating "Made in China."

### 3.    Yoki's Unfair Acts, Infringement, and Dilution of the Crocs 3D Marks

310.    For the reasons set forth below, these Accused Products infringe and are likely to dilute Crocs 3D Marks.

### a.    Crocs Owned Protectable and Famous Trademark Rights Before Yoki Promoted and Sold Accused Products

311.    On information and belief, based on the extensive monitoring performed on Crocs' behalf described above, Yoki began promoting and selling the Accused Products after the Asserted Registered Trademarks were registered and became well-recognized and famous, and after the Vamp Mark was first used in commerce.

312.    The '328 Registration and '875 Registration relevant to Yoki's violations are also the subject of duly issued United States Trademark Registrations.

### b.    Yoki's Accused Products Are Likely to Cause Confusion with the Crocs 3D Marks

313.    As shown in Figure 16 below, Yoki's Accused Products bear designs that are likely to cause confusion with the Crocs 3D Marks. In particular, the size, positioning, number, and shape of the holes on the horizontal portion of the upper of the Accused Products are confusingly similar to the 3D Marks. In addition, the Accused Products have a textured strip along the vertical portion of the upper with trapezoidal openings, which further contributes to the likelihood of consumer confusion. The Accused Products further have a textured strip on the heel of the shoe, and a decorative band along the length of the heel strap.

**FIGURE 16: Representative Images of Yoki's Accused Products and the Crocs Asserted Trademarks**

| Accused Products | Registration No. 5,149,328 | Registration No. 5,273,875 |
|---|---|---|
|  | | |

"Lolli"

### c. Yoki Intended to Copy the Crocs 3D Marks and to Infringe and Dilute the Crocs 3D Marks

314. Yoki's intent to create associations with Crocs and to free ride on Crocs' goodwill is evident from at least the close similarities between Yoki's Accused Products on the one hand, and the famous Crocs 3D Marks on the other hand. On information and belief, the overwhelming similarities are due to Yoki's intentional copying.

### d. Yoki Promotes and Sells Accused Products in Competition with Crocs' Promotion and Sales of Products Bearing the Asserted Trademarks

315. On information and belief, Yoki sells Accused Products through retailers, including Shoe-Nami, who in turn sell Accused Products online and at brick-and-mortar stores. On information and belief, Yoki promotes and sells its Accused Products as casual or lifestyle shoes primarily for women of all ages.

316. On information and belief, Yoki's Accused Products have been promoted and sold for approximately $28.

79

e.      **Relevant Consumers Are Susceptible to Confusion and Dilutive Associations Caused by Yoki's Accused Products.**

317.    Consumers of shoes like those at issue here are not likely to exercise great care in resolving likely confusion in their initial product interest, at the point of purchase, or in post-sale exposure. Even more sophisticated consumers are likely to experience cognitive dissonance regarding the source, affiliation, sponsorship, or association of Yoki's Accused Products when confronted with promotions and sales of Yoki's Accused Products.

318.    In the post-sale context, where actual or potential consumers of shoes may only see Yoki's Accused Products on someone's feet in passing, consumers are also likely to mistake the source, affiliation, or sponsorship of Yoki's Accused Products with Crocs and/or the Asserted Trademarks, or to associate the Accused Products with Crocs and/or the Asserted Trademarks.

f.      **Yoki's Accused Products Are Likely to Cause Confusion and Dilutive Associations with Crocs or the Crocs 3D Marks**

319.    Due to the overwhelming similarities between Yoki's Accused Products and the Crocs 3D Marks, and for the reasons set forth above, there is (a) a likelihood of confusion between Yoki or its Accused Products, and Crocs or the Crocs 3D Marks, and/or (b) a likelihood of dilution between the same.

**L.      Shoe-Nami**

320.    On information and belief, Shoe-Nami, Inc. ("Shoe-Nami") is a Louisiana Corporation with a principal place of business located at 91 Westbank Expressway, Gretna, LA 70053.

**1.      Shoe-Nami's Background**

321.    On information and belief, Shoe-Nami is a shoe retail chain that primarily sells to women of all ages. Shoe-Nami sells its products through at least two brick-and-mortar stores in Louisiana, as well as its website, shoenami.net.

### 2.      Shoe-Nami's Accused Products

322.    Shoe-Nami Accused Products include a variety of different kinds of footwear products that are set forth below. These include the "Vigilante", "Gardener", "Lolli", "Tomika", "Toasty Clogs", and "Fruity with Charms", and are collectively referred to as "Shoe-Nami's Accused Products."

323.    On information and belief, Shoe-Nami has promoted and sold additional shoe models bearing the 3D Marks under various names and style descriptions.

### a.      Vigilante

324.    Shoe-Nami's Accused Products include at least its "Vigilante" footwear products and colorable imitations thereof. Shoe-Nami uses a variety of lengthy, descriptive names to market and sell these Accused Products. For example, these names include the "Vigilante Blue" or the "Vigilante-7"

325.    Shoe-Nami is a retailer of Cape Robbin, and all of Shoe-Nami's "Vigilante" Accused Products are merely a rebranded version of Cape Robbin's "Vigilante" footwear products, and are hereafter treated as such. Representative images of Shoe-Nami's "Vigilante" Accused Products are shown below:

 

326. All the "Vigilante" Accused Products are manufactured abroad and are imported into the United States. Specifically, and as seen in the pictures above, the shoes have a label stating "Made in China."

**b.     Gardener**

327. Shoe-Nami's Accused Products further include at least its "Gardener" footwear products and colorable imitations thereof. Shoe-Nami uses a variety of lengthy, descriptive names to market and sell these Accused Products. For example, these names include the "Gardener-3 Red Bandana" or the "Gardener-4 White Rainbow."

328. Shoe-Nami is a retailer of Cape Robbin, and all of Shoe-Nami's "Gardener" Accused Products are merely a rebranded version of Cape Robbin's "Gardener" footwear products, and are hereafter treated as such. Representative images of Shoe-Nami's "Gardener" Accused Products are shown below:

 

329. All the "Gardener" Accused Products are manufactured abroad and are imported into the United States. Specifically, and as seen in the pictures above, the shoes have a label stating "Made in China."

### c.       Lolli

330.     Shoe-Nami's Accused Products further include at least its "Lolli" footwear products and colorable imitations thereof.

331.     Shoe-Nami is a retailer of Yoki, and all of Shoe-Nami's "Lolli" Accused Products are merely a rebranded version of Yoki's "Lolli" footwear products, and are hereafter treated as such. Representative images of Shoe-Nami's Lolli Accused Products are shown below:



332.     All the Lolli Accused Products are manufactured abroad and are imported into the United States. Specifically, and as seen in the pictures above, the shoes have a label stating "Made in China."

### d.       Tomika

333.     Shoe-Nami's Accused Products further include at least its "Tomika" footwear products and colorable imitations thereof.

334.     Shoe-Nami is a retailer of Wild Diva, and all of Shoe-Nami's "Tomika" Accused Products are merely a rebranded version of Wild Diva's "Tomika" footwear products, and are hereafter treated as such. Representative images of Shoe-Nami's Tomika Accused Products are shown below:



335.    All the Tomika Accused Products are manufactured abroad and are imported into the United States. Specifically, and as seen in the pictures above, the shoes have a label stating "Made in China."

e.    **Toasty Clogs**

336.    Shoe-Nami's Accused Products further include at least its "Toasty Clogs" footwear products and colorable imitations thereof. Representative images of the Toasty Clogs Accused Products are shown below:



337.    All the Toasty Clogs Accused Products are manufactured abroad and are imported into the United States. Specifically, and as seen in the pictures above, the shoes have a label stating "Made in China."

**f.        Fruity with Charms**

338.    Shoe-Nami's Accused Products further include at least its "Fruity with Charms" footwear products and colorable imitations thereof. Representative images of the Fruity with Charms Accused Products are shown below—the shoe charms in the holes of the horizontal portion of the upper are removable:



339.    On information and belief, all the Fruity with Charms Accused Products are manufactured abroad and are imported into the United States.

**3.        Shoe-Nami's Unfair Acts, Infringement, and Dilution of the Crocs 3D Marks**

340.    For the reasons set forth below, these Accused Products infringe and are likely to dilute Crocs 3D Marks.

**a.        Crocs Owned Protectable and Famous Trademark Rights Before Shoe-Nami Promoted and Sold Accused Products**

341.    On information and belief, based on the extensive monitoring performed on Crocs' behalf described above, Shoe-Nami began promoting and selling the Accused Products after the

Asserted Registered Trademarks were registered and became well-recognized and famous, and after the Vamp Mark was first used in commerce.

342.     The '328 Registration and '875 Registration relevant to Shoe-Nami's violations are also the subject of duly issued United States Trademark Registrations.

       **b.**      **Shoe-Nami's Accused Products Are Likely to Cause Confusion with the Crocs 3D Marks, and Have Already Caused Actual Confusion**

343.     As shown in Figure 17 below, Shoe-Nami's Accused Products bear designs that are likely to cause confusion with the Crocs 3D Marks. In particular, the size, positioning, number, and shape of the holes on the horizontal portion of the upper of the Accused Products are confusingly similar to the 3D Marks. In addition, the Accused Products have a textured strip along the vertical portion of the upper with trapezoidal openings, which further contributes to the likelihood of consumer confusion. The Accused Products further have a textured strip on the heel of the shoe, and a decorative band along the length of the heel strap.

**FIGURE 17: Representative Images of Shoe-Nami Accused Products and the Crocs Asserted Trademarks**



| Accused Products | Registration No. 5,149,328 | Registration No. 5,273,875 |
|---|---|---|
| "Lolli" | | |



"Gardener"

"Lolli"

"Tomika"

  

"Toasty Clogs"

  

"Fruity with Charms"

344.    On information and belief, and as discussed above with respect to Cape Robbin's "Verified Buyers" on shopakira.com, consumers have actually confused Shoe-Nami's Accused "Gardener" Products that originate from Cape Robbin with Crocs' footwear products that bear the 3D Marks. These reviews evidence the actual confusion consumers had for Cape Robbin's/Shoe-Nami's Accused "Gardener" Products even at the point of sale.

### c.    Shoe-Nami Intended to Copy the Crocs 3D Marks and to Infringe and Dilute the Crocs 3D Marks

345.    Shoe-Nami's intent to create associations with Crocs and to free ride on Crocs' goodwill is evident from at least the close similarities between Shoe-Nami's Accused Products on

the one hand, and the famous Crocs 3D Marks on the other hand. On information and belief, the overwhelming similarities are due to Shoe-Nami's intentional copying

### d. Shoe-Nami Promotes and Sells Accused Products in Competition with Crocs' Promotion and Sales of Products Bearing the Asserted Trademarks

346.    On information and belief, Shoe-Nami promotes and sells its Accused Products online through its own website, shoenami.net, as well as through retail stores.

347.    On information and belief, Shoe-Nami's Accused products have been promoted and sold at prices ranging from approximately $28 to $48.

348.    On information and belief, Shoe-Nami promotes and sells its Accused Products as casual or lifestyle shoes primarily for women of all ages.

### e. Relevant Consumers Are Susceptible to Confusion and Dilutive Associations Caused by Shoe-Nami's Accused Products

349.    Consumers of shoes like those at issue here are not likely to exercise great care in resolving likely confusion in their initial product interest, at the point of purchase, or in post-sale exposure. Even more sophisticated consumers are likely to experience cognitive dissonance regarding the source, affiliation, sponsorship, or association of Shoe-Nami's Accused Products when confronted with promotions and sales of Shoe-Nami's Accused Products.

350.    In the post-sale context, where actual or potential consumers of shoes may only see Shoe-Nami's Accused Products on someone's feet in passing, consumers are also likely to mistake the source, affiliation, or sponsorship of Shoe-Nami's Accused Products with Crocs and/or the Asserted Trademarks, or to associate the Accused Products with Crocs and/or the Asserted Trademarks.

      **f.**      **Shoe-Nami's Accused Products Are Likely to Cause Confusion and Dilutive Associations with Crocs or the Crocs 3D Marks**

351.    Due to the overwhelming similarities between Shoe-Nami's Accused Products and the Crocs 3D Marks, and for the reasons set forth above, there is (a) a likelihood of confusion between Shoe-Nami or its Accused Products, and Crocs or the Crocs 3D Marks, and/or (b) a likelihood of dilution between the same.

      **4.**      **Shoe-Nami's Unfair Acts, Infringement, and Dilution of the Crocs Word Mark**

352.    For the reasons set forth below, these Accused Products infringe and are likely to dilute Crocs Word Mark.

      **a.**      **Crocs Owned Protectable and Famous Trademark Rights Before Shoe-Nami Promoted and Sold Accused Products**

353.    On information and belief, based on the extensive monitoring performed on Crocs' behalf described above, Shoe-Nami began promoting and selling the Accused Products after the Word Mark was registered and became well-recognized and famous.

354.    The Asserted Word Mark relevant to Shoe-Nami's violations is also the subject of a duly issued United States Trademark Registration.

      **b.**      **Shoe-Nami's Use of the Word Mark in Connection with its Sale of the Accused Products Is Likely to Cause Confusion with the Crocs Word Mark**

355.    Shoe-Nami uses the Crocs Word Mark in connection with the marketing and sale of goods through its social media platforms, including Instagram and Facebook.

356.    For example, Shoe-Nami uses the Word Mark "CROCS" with respect to the marketing and sale of its "Gardener" footwear products. In the sales copy for the "Gardener" on Shoe-Nami's Instagram account, the shoe is marketed with the word "#platformcrocs" and invites

the user to "TAP PIC TO SHOP" for the Accused Products (i.e., to click an embedded link in the image to purchase them), as shown below:



357.   Shoe-Nami also promotes and markets its "Gardener" shoes with a set of shoe charms, which it calls "#croccharms" on its Facebook account and invites the user to "TAP PIC TO SHOP" for the Accused Products as shown below:



358.    Similarly, Shoe-Nami uses the Word Mark "CROCS" with respect to the marketing and sale of its "Vigilante" footwear products. In the sales copy for the Vigilante on Shoe-Nami's Facebook account, the shoe is marketed with the word "#croccharms" and invites the user to "TAP PIC TO SHOP" as shown below:



359.    Similarly, Shoe-Nami uses the Word Mark "CROCS" with respect to the marketing and sale of its "Fruity with Charms" footwear products. In the sales copy for the Fruity with

Charms on Shoe-Nami's Facebook account, the shoe is marketed with the word "#croccharms" and invites the user to "TAP PIC TO SHOP" for the Accused Products as shown below:



360.   Further, Shoe-Nami uses the Word Mark "CROCS" with respect to the marketing and sale of its "Toasty Clogs" footwear products. In the sales copy for the Fruity with Charms on Shoe-Nami's Facebook account, the shoe is marketed with the word "#croccharms" and invites the user to "TAP PIC TO SHOP" for the Accused Products as shown below:



361.    Additionally, Shoe-Nami uses the Word Mark "CROCS" with respect to the marketing and sale of its "Tomika" footwear products. In the sales copy for the Fruity with Charms on Shoe-Nami's Facebook account, the shoe is marketed with the words "#croccharms" and "Anti Croc Croc Club" and invites the user to "TAP PIC TO SHOP" for the Accused Products as shown below:



362.     Shoe-Nami's use of this Word Mark is likely to cause confusion among consumers, who are likely to mistakenly believe that Crocs is the source of these Accused Products.

### c.       Shoe-Nami Intended to Copy the Crocs Word Mark and to Infringe and Dilute the Crocs Word Mark

363.     Shoe-Nami's intent to create associations with Crocs and to free ride on Crocs' goodwill is evident from their use of the word "CROCS" to sell footwear products. Shoe-Nami is using the exact Word Mark without alteration. On information and belief, this was intentionally done to copy Crocs Word Mark.

### d.       Shoe-Nami Promotes and Sells Accused Products in Competition with Crocs' Promotion and Sale of Products Bearing the Asserted Trademarks

364.     On information and belief, Shoe-Nami promotes and sells its Accused Products online through its own website, shoennami.net.

365.     On information and belief, Shoe-Nami's Accused Products have been promoted and sold for approximately $28 to $48.

366.     On information and belief, Shoe-Nami promotes and sells its Accused Products as casual or lifestyle shoes primarily for women of all ages.

### e.       Relevant Consumers Are Susceptible to Confusion and Dilutive Associations Caused by Shoe-Nami's Accused Products

367.     Consumers of shoes like those at issue here are not likely to exercise great care in resolving likely confusion in their initial product interest or at the point of purchase. Even more sophisticated consumers are likely to experience cognitive dissonance regarding the source, affiliation, sponsorship, or association of Shoe-Nami's Accused Products when confronted with promotions and sales of Shoe-Nami's Accused Products.

       **f.**       **Shoe-Nami's Accused Products Are Likely to Cause Confusion and Dilutive Associations with Crocs or the Crocs Word Mark**

368. For the reasons set forth above and due to Shoe-Nami's outright copying of the Crocs Word Mark, there is (a) a likelihood of confusion between Shoe-Nami or its Accused Products, and Crocs or the Crocs Word Mark, and/or (b) a likelihood of dilution between the same.

**M.**       **ZhengDe Network d/b/a Amoji**

369. On information and belief, Quanzhou ZhengDe Network Corp. d/b/a Amoji ("Amoji") is a Chinese Corporation with its principal place of business located at Rm. C-409, No. 2 YanZhi Gallery, Licheng District, Quanzhou, Fujian Province, China 362002.

**1.**       **Amoji's Background**

370. On information and belief, Amoji was founded in or around 2016. *Id.* On its website, Amoji claims that "Our story began in 2016, when we discovered that wearing clogs became a popular trend among a large amount of people, but brands like crocs are too expensive for many people to afford." *Id.*

371. Amoji primarily sells its products through amazon.com, as well as its own website, amoji.com.

**2.**       **Amoji's Accused Products**

372. Amoji's Accused Products include at least its "Garden Clogs" footwear products and colorable imitations thereof. Representative images of Amoji's Accused Products are shown below:

 

373.    On information and belief, Amoji has promoted and sold additional shoe models bearing the 3D Marks under various names and style descriptions.

374.    The Accused Products are manufactured abroad and are imported into the United States. Specifically, and as seen in the pictures above, the shoes have a label stating "Made in China."

### 3.    Amoji's Unfair Acts, Infringement, and Dilution of the Crocs 3D Marks

375.    For the reasons set forth below, these Accused Products infringe and are likely to dilute Crocs 3D Marks.

### a.    Crocs Owned Protectable and Famous Trademark Rights Before Amoji Promoted and Sold Accused Products

376.    On information and belief, based on the extensive monitoring performed on Crocs' behalf described above, Amoji began promoting and selling the Accused Products after the Asserted Registered Trademarks were registered and became well-recognized and famous, and after the Vamp Mark was first used in commerce.

377.    The '328 Registration and '875 Registration relevant to Amoji's violations are also the subject of duly issued United States Trademark Registrations.

**b.  Amoji's Accused Products Are Likely to Cause Confusion with the Crocs 3D Marks**

378.  As shown in Figure 18 below, Amoji's Accused Products bear designs that are likely to cause confusion with the Crocs 3D Marks. In particular, the size, positioning, number, and shape of the holes on the horizontal portion of the upper of the Accused Products are confusingly similar to the 3D Marks. In addition, the Accused Products have a textured strip along the vertical portion of the upper with trapezoidal openings, which further contributes to the likelihood of consumer confusion. The Accused Products further have a textured strip on the heel of the shoe, and a decorative band along the length of the heel strap.

**FIGURE 18: Representative Images of Amoji's Accused Products and the Crocs Asserted Trademarks**

| Accused Products | Registration No. 5,149,328 | Registration No. 5,273,875 |
|---|---|---|



"Men's Garden Shoes"

**c.  Amoji Intended to Copy the Crocs 3D Marks and to Infringe and Dilute the Crocs 3D Marks**

379.  Amoji's intent to create associations with Crocs and to free ride on Crocs' goodwill is evident from at least the close similarities between Amoji's Accused Products on the one hand, and the famous Crocs 3D Marks on the other hand. In particular, Amoji notes on its website that

it was trying to produce a cheaper alternative to crocs. On information and belief, the overwhelming similarities are due to Amoji's intentional copying.

> ### d. Amoji Promotes and Sells Accused Products in Competition with Crocs' Promotion and Sales of Products Bearing the Asserted Trademarks

380. On information and belief, Amoji promotes and sells its Accused Products Primarily through the Internet.

381. On information and belief, Amoji's Accused Products have been promoted and sold for approximately $25.

382. On information and belief, Amoji promotes and sells its Accused Products as a casual or lifestyle shoe for people of all ages.

> ### e. Relevant Consumers Are Susceptible to Confusion and Dilutive Associations Caused by Amoji's Accused Products

383. Consumers of shoes like those at issue here are not likely to exercise great care in resolving likely confusion in their initial product interest, at the point of purchase, or in post-sale exposure. Even more sophisticated consumers are likely to experience cognitive dissonance regarding the source, affiliation, sponsorship, or association of Amoji's Accused Products when confronted with promotions and sales of Amoji's Accused Products.

384. Further, in the post-sale context, where actual or potential consumers of shoes may only see Amoji's Accused Products on someone's feet in passing, consumers are also likely to mistake the source, affiliation, or sponsorship of Amoji's Accused Products with Crocs and/or the Asserted Trademarks, or to associate the Accused Products with Crocs and/or the Asserted Trademarks.

        **f.**      **Amoji's Accused Products Are Likely to Cause Confusion and Dilutive Associations with Crocs or the Crocs 3D Marks**

385.    Due to the overwhelming similarities between Amoji's Accused Products and the Crocs 3D Marks, and for the reasons set forth above, there is (a) a likelihood of confusion between Amoji or its Accused Products, and Crocs or the Crocs 3D Marks, and/or (b) a likelihood of dilution between the same.

### COUNT I: TRADEMARK INFRINGEMENT UNDER SECTION 32(1) OF THE LANHAM ACT (15 U.S.C. § 1114(1)) (AGAINST ALL DEFENDANTS)

386.    Crocs hereby reasserts the allegations set forth in the preceding paragraphs and incorporates them by reference.

387.    As alleged more fully herein, the USPTO has granted Crocs federal trademark registrations for Registered Trademark Nos. 3,836,415; 5,149,328; and 5,273,875 as set forth in Section I.A, *supra*.

388.    Crocs used Registered Trademark Nos. 3,836,415; 5,149,328; and 5,273,875 in commerce before Defendants began their unauthorized uses of these three Asserted Trademarks.

389.    Defendants' unauthorized sales and attempted sales of their respective Accused Products containing Crocs' Registered Trademark Nos. 3,836,415; 5,149,328; and 5,273,875 as set forth in Table 1, to unsuspecting consumers is a violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

390.    Defendants' past and continued sales of their Accused Products has created a substantial likelihood of confusion and caused mistake and deception in consumers' minds.

391.    Defendants' unauthorized use of Crocs' Registered Trademark Nos. 3,836,415; 5,149,328; and 5,273,875, as set forth above, constitutes use in commerce, without Crocs' consent, of a reproduction, counterfeit, copy, or colorable imitation of Crocs' Registered Trademark Nos.

3,836,415; 5,149,328; and 5,273,875 in connection with the advertisement, promotion, sale, and distribution of products and/or services. Such use is likely to cause confusion or mistake, or to deceive customers, and therefore infringes Crocs' Trademarks, in violation of 15 U.S.C. § 1114(1).

392.    As a result of Defendants' continued sale of their Accused Products, Crocs has suffered and will continue to suffer irreparable harm to its goodwill and reputation with not only its customers, who confuse the Accused Products with legitimate Crocs Products, but also with the general public, who are confused as to the source of the Accused Products after they have been sold.

393.    Crocs has no adequate remedy at law for this immediate and continuing harm. Crocs has been, and absent injunctive relief will continue to be, irreparably harmed by Defendants' Actions.

## COUNT II: FALSE DESIGNATION OF ORIGIN/UNFAIR COMPETITION UNDER SECTION 43(a) OF THE LANHAM ACT (15 U.S.C. § 1125(a)) (AGAINST ALL DEFENDANTS)

394.    Crocs hereby reasserts the allegations set forth in the preceding paragraphs and incorporates them by reference.

395.    Defendants' use of Crocs' Asserted Trademarks, as set forth in Table 1 and in the manner alleged herein, constitutes a false designation of origin within the meaning of Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A), which is likely to cause confusion, mistake, or deception as to the affiliation, connection, source, origin, authorization, sponsorship, and/or approval of Defendants' commercial activities with respect to Crocs' Asserted Trademarks.

396.    Crocs used these Asserted Trademarks in commerce before Defendants began their unauthorized uses of the Asserted Trademarks.

397.    The consuming public is likely to attribute to Crocs Defendant's use of Crocs' Trademarks as a source of origin, authorization, and/or sponsorship for the products Defendants

sell and, further, purchase products from Defendants in the erroneous belief that Defendants are authorized by, associate with, sponsored by, or affiliated with Crocs, when there is no such connection between Crocs and Defendants.

398.     Defendants' actions have been conducted intentionally and willfully, with the express intent to cause confusion and mistake, to deceive the consuming public, to trade upon the quality and reputation of Crocs, and to appropriate Crocs' valuable trademark rights.

399.     Defendants' conduct has deceived, and is likely to continue to deceive, a material segment of the consumers to whom they have directed their marketing activities.

400.     As a result of this misconduct, Crocs has suffered, and will continue to suffer, irreparable harm to its goodwill and reputation with both its customers and the general public, who are confused as to the source of the Accused Products after they have been sold.

401.     Crocs has no adequate remedy at law for this immediate and continuing harm. Crocs has been, and absent injunctive relief will continue to be, irreparably harmed by Defendants' Actions.

## COUNT III - TRADEMARK DILUTION UNDER SECTION 43(c) OF THE LANHAM ACT (15 U.S.C. § 1125(c)) (AGAINST ALL DEFENDANTS)

402.     Crocs hereby reasserts the allegations set forth in the preceding paragraphs and incorporates them by reference.

403.     Crocs' Registered Trademark Nos. 3,836,415; 5,149,328; and 5,273,875 are "famous" as defined in 15 U.S.C. § 1125(c). Defendants' use of these marks constitutes a use of these famous trademarks in commerce.

404.     Crocs used Registered Trademark Nos. 3,836,415; 5,149,328; and 5,273,875 in commerce—and those three Registered Trademarks became famous—before Defendants began their unauthorized uses of these Registered Trademarks.

405.     Crocs' Registered Trademark Nos. 3,836,415; 5,149,328; and 5,273,875 are widely recognized by the general consuming public of the United States as designations of source of goods and services. As set forth above, Crocs' Registered Trademark Nos. 3,836,415; 5,149,328; and 5,273,875 are widely recognized in the United States and around the world, and consumers instantly recognize the connection between Crocs and these famous marks.

406.     Defendants' sales and offers for sale of their respective Accused Products violate Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c). The Defendants do so intentionally and maliciously. This has the effect of diluting the distinctive quality of Crocs' Registered Trademark Nos. 3,836,415; 5,149,328; and 5,273,875, as well as tarnishing the good will consumers associate with these Asserted Trademarks.

407.     As a result of this misconduct, Crocs has suffered, and will continue to suffer, irreparable harm to its goodwill and reputation with both its customers and the general public, as Defendants' conduct lessens the value Registered Trademark Nos. 3,836,415; 5,149,328; and 5,273,875 as identifiers of Crocs' goods and services.

408.     Crocs has no adequate remedy at law for this immediate and continuing harm. Crocs has been, and absent injunctive relief will continue to be, irreparably harmed by Defendants' Actions.

### COUNT IV - UNFAIR AND DECEPTIVE TRADE PRACTICES
### (COLO. REV. STAT. ANN. § 6-1-101) (AGAINST ALL DEFENDANTS)

409.     Crocs reasserts the allegations in the preceding paragraphs and incorporates them by reference.

410.     Defendants' acts constitute unfair and deceptive trade practices in violation of the Colorado Consumer Protection Act, Colo. Rev. Stat. Ann. § 6-1-101 *et seq.*

411.     Defendants' infringing activities have damaged and caused irreparable harm to Crocs and, unless restrained, will continue to damage and cause irreparable injury to Crocs' good will and reputation.

412.     Defendants' acts have injured, and will continue to injure, Crocs by, among other things, diluting Crocs' 3D Marks, confusing customers, and injuring Crocs' reputation.

413.     Defendants' use of Crocs' 3D Marks deceives customers and potential customers regarding the origin of Crocs' goods and services. In particular, Defendants knowingly pass of their respective Accused Products as legitimate Crocs' products. Defendants did this in bad faith.

414.     In addition, Defendants have traded off of Crocs' popularity and goodwill in marketing, selling, and profiting from their Accused Products. Defendants' Accused Products have caused, and are likely to cause in the future, impairment of the distinctiveness of the 3D Marks due consumers' association with Defendants' similar marks and trade names. Similarly, the reputation of Crocs' 3D Marks has been harmed, and is likely to be harmed in the future, through its association with Defendants' similar marks and trade names, which occurs as a result of the promotion and sale of the Accused Products. This confusion and dilution diminish, or threaten to diminish, the capacity of the 3D Marks to distinguish Crocs goods, constituting substantial present and likely future harm to Crocs.

415.     Crocs has no adequate remedy at law for this immediate and continuing harm. Crocs has been, and absent injunctive relief will continue to be, irreparably harmed by Defendants' actions.

**COUNT V - COMMON LAW UNFAIR COMPETITION**
**(AGAINST ALL DEFENDANTS)**

416.     Crocs hereby reasserts the allegations set forth in the preceding paragraphs and incorporates them by reference.

417.    The Crocs 3D Marks acquired substantial secondary meaning and became famous or otherwise well-recognized in the marketplace before Defendants commenced their unauthorized uses of the Crocs 3D Marks in connection with the Accused Products.

418.    The Crocs Word Mark is Arbitrary and is therefore inherently distinctive. It became famous or otherwise well-recognized in the marketplace before Defendants commenced their unauthorized uses of the Crocs Word Mark in connection with the Accused Products.

419.    All the asserted trademarks have become a single source identifier distinctly associated with Plaintiff.

420.    Defendants' use of the Asserted Trademarks has or will likely cause confusion in the minds of consumers familiar with Crocs' Asserted Trademarks. In particular, Defendants use the Asserted Trademarks for casual footwear products, which is how Crocs uses the Asserted Trademarks. Accordingly consumers of Crocs' Asserted Trademarks will be deceived or confused, or will otherwise be mistaken, as to the source of the business in question when they encounter Defendants' Accused Products.

421.    In addition, Defendants have traded off of Crocs' popularity and goodwill in marketing, selling and profiting from the sale of their Accused Products.  Defendants' Accused Products have caused, and are likely to cause in the future, impairment of the distinctiveness of the Asserted Trademarks due to association by consumers with Defendants' similar marks and trade names. Similarly, the reputation of Crocs' Asserted Trademarks has been harmed, and is likely to be harmed in the future, through its association with Defendants' similar marks and trade names, which occurs as a result of the promotion and sale of the Accused Products. This confusion and dilution diminishes, or threatens to diminish, the capacity of the Asserted Trademarks to distinguish Crocs goods, constituting substantial present and likely future harm to Crocs.

422.    As a result of this misconduct, and other instances of unfair competition that Defendants have engaged, Crocs has suffered, and will continue to suffer, irreparable harm to its goodwill and reputation with both its customers and the general public.

423.    Crocs has no adequate remedy at law for this immediate and continuing harm. Crocs has been, and absent injunctive relief will continue to be, irreparably harmed by Defendants' Actions.

## JURY DEMAND

Crocs demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, by reason of the foregoing, Plaintiff Crocs requests that this Court enter judgment in its favor and for relief against Defendants, and each of them, as follows:

A.  That the Court enter judgment that:

1.  Each Defendant has violated Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1);

2.  Each Defendant has engaged in false designation of origin in violation of Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A);

3.  Each Defendant has engaged in trademark dilution in violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c);

4.  Each Defendant has engaged in unfair competition in violation of the common law of the State of Colorado; and

5.  Each Defendant has engaged in unfair competition in violation of the common law of the State of Colorado.

B. That the Court issue a permanent injunction restraining and enjoining each Defendant, and all of its agents, servants, officers, employees, successors, and assigns, and all other persons or entities in active concert or participation with each Defendants from:

1. Selling, marketing, advertising, importing, or purchasing the Accused Products or colorable imitations thereof;

2. Using any of Plaintiff's Trademarks and/or any other confusingly similar designation, alone or in combination with other words, phrases, symbols, or designs, as trademarks, trade names, domain name components or otherwise, to market, advertise, or identify any of Defendant's goods or services;

3. Otherwise infringing Plaintiff's Trademarks;

4. Diluting Plaintiff's Registered Trademarks;

5. Representing or taking any other action likely to cause confusion, mistake, or deception on the part of consumers as to the source or origin of Defendants' products or services or as to any authorization, sponsorship, approval, or affiliation relationship between each Defendant and Plaintiff;

6. Unfairly competing with Plaintiff in any manner whatsoever or otherwise injuring its business reputation in the manner complained of herein; and

7. Engaging in assignments or transfers, formation of new entities or associations or utilization of any other device for the purpose of circumventing or otherwise avoiding the prohibitions set forth in sub-paragraphs (1) through (6) above.

C. That the Court enter an order pursuant to 15 U.S.C. §§ 1116, 1118 requiring each Defendant, its agents, servants, officers, employees, successors, and assigns, to destroy all

Accused Products or colorable imitations thereof that are in each Defendant's possession, custody, or control

D. That the Court enter an order, pursuant to 15 U.S.C. § 1116, requiring each Defendant to file with the Court and serve upon Plaintiff within 30 days after the entry of each of the preliminary and permanent injunctions a report, in writing and under oath, setting forth in detail the manner in which each Defendant has complied with Paragraphs B and C, *supra*.

E. That the Court enter an order pursuant to 15 U.S.C. § 1117 awarding all profits received by each Defendant from the sales and revenues of any kind made as a result of each Defendant's sales of Accused Products and colorable imitations thereof, and damages, to be determined, that Plaintiff has suffered as a result of Defendants' sales and marketing of the Accused Products and colorable imitations thereof.

F. That the Court enter an order awarding damages and costs to the fullest extent provided for by Colorado Law, including treble damages under Colo. Rev. Stat. Ann. § 6-1-113 or punitive damages, whichever is greater.

G. That the Court enter an order awarding Plaintiff's attorneys' fees and costs.

H. That the Court enter an order awarding Plaintiff's pre-judgment and post-judgment interest.

I. That the Court enter such other relief as it deems proper and just.

Respectfully Submitted,

Dated: July 12, 2021
San Francisco, CA

*/s/ Michael A. Berta*
Michael A. Berta
ARNOLD & PORTER KAYE SCHOLER LLP
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111-4024
Telephone: (415) 471-3100
Facsimile:  (415) 471-3400
michael.berta@arnoldporter.com
Attorney for Plaintiff Crocs, Inc.